UNITED STATES of America

v.

Richard P. HERMAN, Appellant.

UNITED STATES of America

v.

James J. McCANN, Appellant in No. 78–1282.

Nos. 78–1252, 78–1282.

United States Court of Appeals, Third Circuit.

Argued Sept. 8, 1978.

Decided Nov. 17, 1978.

As Amended Dec. 27, 1978.

Garth, Circuit Judge, filed an opinion concurring in part and dissenting in part.

Richard H. Martin, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., for Richard P. Herman.

Thomas A. Livingston, Dennis J. Clark, Pittsburgh, Pa., for James J. McCann.

Blair A. Griffith, U. S. Atty., James J. West, Asst. U. S. Atty., Bruce A. Antkowiak, Jeffrey A. Manning, Asst. U. S. Attys., Pittsburgh, Pa., for appellee.

Before GIBBONS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

In these consolidated appeals Richard P. Herman (No. 78–1252) and James J. McCann (No. 78–1282), former state court magistrates in Allegheny County, Pennsylvania, appeal from judgments of sentence following their conviction for violating the Racketeer Influenced and Corrupt Organizations Act (RICO).[1] We affirm Herman's conviction but reverse and remand for a new trial in McCann's case.

The first count of the indictment charged Herman, McCann and others with conspiring to accept bribes offered by a bail bonding firm know as the Levitt Agency for the purpose of affecting their official behavior in fixing bail in criminal cases, in violation of 18 U.S.C. § 1962(d). In the second count, each man was charged with the substantive offense proscribed by § 1962(c) of associating with the Levitt Agency, an enterprise in commerce, and conducting its affairs through a pattern of racketeering activity. Before trial the defendants moved to dismiss the indictment and to suppress certain evidence. The district court granted these motions, the government appealed, and this court reversed.[2] When on remand the indictment was moved for trial Herman and McCann were severed from the remaining defendants because of ill health.[3] They were tried together with two constables, Zanello and Phillips, and found guilty.

The government's chief witness was Stephen C. Levitt, who had pled guilty to a violation of 18 U.S.C. § 1962(d). Levitt testified that from February of 1970 through May of 1975 he operated a bail bond agency in Pittsburgh, Pennsylvania, writing surety bonds for persons charged with crimes throughout Western Pennsylvania. The principal and qualified surety for the agency was Stuyvesant Insurance Company, to whom Levitt was required to pay 2% of the face amount of each valid bond issued by the agency. Early in 1970 he made an arrangement with certain magistrates in Allegheny County to pay a kickback of 50% of the surety bond premium to magistrates who referred bail bond business to his newly established agency. When a defendant was referred to him by one of these magistrates, Levitt would usually post an invalid bond with the court. In some cases, he would post a surety bond without including the power of attorney required to bind Stuyvesant as surety; in others, he would post a worthless property bond. Both devices avoided the necessity of making any premium payment to Stuyvesant. If the case was dismissed at the preliminary hearing he would split the gross premium with the magistrate. If the case was held for court he would deduct the cost of obtaining a valid power of attorney, and split the remainder of the premium. Often after a valid bond had been posted the magistrate would surreptitiously reduce the amount of the bond with no premium refund to the defendant, thereby lowering the required payment to the surety and increasing the sum which was split with the magistrate. Relying upon the Levitt Agency files,[4] which listed individual bond transactions by date and name of defendant, Levitt illustrated how he had calculated the specific sums paid to Herman and McCann on account of each bond. He further testified that on each such occasion he had placed the money in an envelope with the appropriate magistrate's name on it, and had either personally delivered the envelope to the magistrate or one of his employees, or directed that it be so delivered.

1. Pub.L. 91–452, 18 U.S.C. § 1961 et seq. (1970).

2. United States v. Forsythe, 560 F.2d 1127 (3d Cir. 1977), rev'g, 429 F.Supp. 715 (W.D.Pa. 1977).

3. Appeals from the convictions of the remaining defendants are pending in this court at Docket Nos. 78–1123–1170.

4. Exhibits V–1 through V–32 and V–34 related to McCann. Exhibits R–1 through R–28 related to Herman.

Victor Kozlowski, a former bailbondsman at the Levitt Agency, testified under a grant of immunity. He corroborated Levitt's testimony, and stated that at Levitt's direction he personally had delivered kickbacks to Herman and McCann for cases in which he had written the bail bonds at their office. Mary Hupert, formerly a secretary at the Agency, also testified under an immunity grant. She stated that she had observed, and later prepared, envelopes directed to Herman and McCann and that she had received phone calls from both magistrates and their staffs referring bail bond clients to the Levitt Agency. She further testified that she recalled an occasion on which Magistrate Herman's son had picked up a payment envelope at the Levitt Agency.

Eugene Benedik, a former constable in McCann's office, testified that McCann had personally instructed him to refer arrested persons in need of a bond to the Levitt Agency. He also stated that he had picked up kickbacks from the Levitt Agency and had divided those payments with McCann and with his co-constable, one Wagner. Special Agent Marinaro of the FBI testified that during a lengthy interview with the FBI on February 25, 1976, Herman had admitted that he had sent his son to pick up an envelope containing several hundred dollars from the Levitt Agency as kickback payments on bonds written in cases heard before him.

## McCANN'S APPEAL

██ During its case in chief the government attempted to introduce the testimony

of Jacob Winner, who operated a bail bond agency in Pittsburgh known as the American Bonding Company, to the effect that between 1970 and 1972 he paid to Herman and McCann 50% of his premiums on all bonds which he posted in cases where they had fixed bail. The trial court ruled that the testimony was inadmissible. After the government rested its case McCann testified in his own defense. He denied having taken money or anything of value from the Levitt Agency. Neither in his direct testimony or on cross examination did he mention Winner or the American Bonding Company. He also presented the testimony of three constables who worked in his office, his secretary, and a local police chief, all of whom stated that they had no knowledge of a kickback or referral arrangement with McCann's office. Each of these witnesses testified only to his or her own lack of knowledge of any payoffs or referrals, not that no payoff from a bail bond agency ever occurred.[5] Since McCann's defense counsel was well aware of Winner's availability to the prosecution he quite carefully avoided any testimony which can fairly be construed as a denial of wrongdoing with respect to any bail bond agency other than the Levitt Agency. The defense did, however, present the testimony of seventeen character witnesses. Many of these testified, without objection, to specific acts of benevolence by McCann.

In rebuttal the government sought once again to introduce the Winner testimony.[6] McCann's counsel objected. He pointed

5. On cross examination the government succeeded in eliciting from McCann's secretary, Anna Charding, the response that "he [i. e., McCann] never recommended [bailbondsmen] either." (945a). It relies on this as a denial on McCann's behalf of any referrals, even to Winner. Taken in context, however, it is nothing more than a shorthand reiteration of her direct testimony about her lack of knowledge of kickbacks or referrals. Had she attempted to assert anything more than her own lack of knowledge her statement would have been hearsay. We reject the government's contention that McCann offered testimony that no referrals were ever made, and its conclusion that it could therefore offer other crimes evidence

contradicting that assertion. We therefore have no occasion to consider the applicability of the doctrine of *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) to the cross-examination testimony of a non-defendant witness.

6. The government's offer of proof:
   MR. MANNING: Okay. Mr. Winner will testify that from 1970 to 1972, he operated a bail bond business in Allegheny County known as *American Bonding Company;* during that period of time he was a surety bondsman who wrote bonds on the Public Service Mutual Insurance Corporation of New York; he will testify that during the course of 1970 through 1972, he received

out, and the court agreed,[7] that McCann's denial of receipt of kickbacks was limited solely to the Levitt Agency. The court, however, ruled that the Winner testimony was admissible solely as rebuttal to the character evidence offered by McCann.[8] Winner then testified substantially as set forth in the government's offer of proof. In its charge the trial court restated the limited purpose for which the Winner testimony had been admitted, admonishing the jury that it could not be considered for any purpose except to rebut the character testimony that was offered by McCann.[9] McCann contends that the court erred in admitting the testimony even for that purpose.

■ Neither in its ruling nor in the jury charge did the court make any reference to the federal rule of evidence relied upon for admission of the Winner testimony. Since McCann had testified, it is possible that the court had in mind rule 608, which governs the admission of evidence concerning the character and conduct of witnesses. If so, admission of the Winner testimony was error, for rule 608(b) expressly provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence." *E. g., United States v. Edwards,* 549 F.2d 362, 367–68 (5th Cir.), *cert. denied,* 434 U.S. 828, 98 S.Ct. 107, 54 L.Ed.2d 87 (1977); *United States v. Cluck,* 544 F.2d 195, 196 (5th Cir. 1976); *United States v. Blackshire,* 538 F.2d 569 (4th Cir.), *cert. denied,* 429 U.S. 840, 97 S.Ct. 113, 50 L.Ed.2d 108 (1976).

■ The government urges that a judge-made exception to rule 608(b) permits contradiction by specific uncharged acts of misconduct when a defendant's own testimony places his conduct or character in a "false light." For this proposition it cites *United States v. Batts,* 558 F.2d 513 (9th Cir. 1977), *modified on rehearing,* 573 F.2d 599 (1978). In *Batts,* the defendant was charged with smuggling hashish. When arrested he was wearing a "coke spoon." During questioning about the spoon during cross examination, he denied all knowledge of cocaine use. The court of appeals originally held that this general denial justified admission under rule 608(b) of rebuttal testimony that

referrals of bail bond clients from Magistrate James McCann; he will identify Magistrate McCann; and he will testify that he split the money he received from the defendants on bond premiums 50/50 with Magistrate McCann and that he paid him those premiums personally.

7. THE COURT: Was there any testimony by James McCann that he never took kickbacks from anyone?

MR. LIVINGSTON: There was not, your Honor.

THE COURT: As I recall, he testified only that he did not take kickbacks from the Levitt Agency.

8. THE COURT: Well, I am going to overrule the objection consistent with my previous rulings in previous cases, that where the reputation of the defendant is put in specifically, that it then becomes a question for the Jury whether that reputation evidence, when taken into account with all the other evidence, prevents the Jury from believing—or, to put it in reverse, that the Jury is not convinced beyond a reasonable doubt under all the evidence that the defendant was guilty of all of the essential elements of the crimes with which he is charged.

I believe it is admissible solely in rebuttal to the character testimony or reputation testimony.

9. The court charged:

You will recall then that the Government offered in rebuttal the testimony of Jacob Winner to the effect that he paid money to the Defendant identified by him as Squire McCann for the referral of criminal defendants to his bonding agency. Now, the Winner testimony may be considered by you in your determination of the character of the Defendant and whether that character is such that it raises a reasonable doubt in your mind that the Defendant is guilty of the crime charged. Whether the Defendant's character testimony as to excellent reputation does raise a reasonable doubt will depend upon the credibility of that testimony and the weight you give it in light of all the evidence, including the rebuttal testimony of Jacob Winner. You cannot use the testimony of Jacob Winner for any other purpose except as rebuttal to the character testimony that was offered, and you cannot convict any defendant unless you find, of course, that the other evidence in the case established beyond a reasonable doubt every essential element of the crime charged.

the defendant had recently sold a large quantity of cocaine to an undercover agent. Judge Kennedy's persuasive dissent in *Batts,* 558 F.2d at 519, to the effect that the majority misconstrued the intention of the draftsmen of rule 608(b), would make us hesitate to accept the "false light" rationale even if the record supported its application. *See* Weinstein's Evidence ¶ 608[5] at 608–28 (1977); Note, 9 Rut.–Cam. J. L. 375 (1977). Moreover, we cannot help but think that the *Batts* court's subsequent modification of the opinion to eliminate all reliance upon rule 608(b) as a ground of admissibility at least implicitly acknowledges the force of Judge Kennedy's view of the matter. But *Batts* is distinguishable from this case. Here, as the trial judge acknowledged, McCann's testimony was limited to the Levitt Agency transactions. He made no assertion of his general probity and the Winner testimony rebutted no false light created by him. Moreover, none of the witnesses stated more than their lack of knowledge of the receipt of kickbacks or the making of referrals. Thus the *Batts* rationale would not on this record support admissibility of Winner's testimony.

Rule 405 governs use of specific evidence of conduct to prove good or bad character. It restricts such evidence to expressions of reputation or of opinion. It does not permit the affirmative use of specific instances of conduct except where "character or a trait of character of a person is an essential element of a charge, claim or defense." Fed.R.Evid. 405(b). That ground of admissibility is unavailable in this prosecution. The only other use of specific instances of conduct authorized by the rule is in cross examination of character witnesses. Fed.R. Evid. 405(a). No such cross examination took place. If it had, and a witness had denied knowledge of a specific instance of conduct called to his attention, an argument might be made that the Winner testimony was admissible to contradict the witness's denial. But on this record that argument was foreclosed.

. Nevertheless the government relies on dictum in *United States v. Chrzanowski,* 502 F.2d 573, 576 (3d Cir. 1974), which states that prior crimes testimony is properly admissible "to rebut the testimony of the character witnesses by showing that the defendants had committed similar acts." But as Judge Hunter's concurring opinion makes clear, the character witnesses in *Chrzanowski* went beyond statements of reputation or opinion, and testified to specific events tending to show a legitimate modus operandi. 502 F.2d at 579. Thus the propriety of the use of specific events evidence in the *Chrzanowski* case turns on the defense's decision there to place modus operandi in issue in its own direct case. *See Government of the Virgin Islands v. Toto,* 529 F.2d 278, 283 (3d Cir. 1976). If the *Chrzanowski* court intended that its dictum be given a broader reading, the text of rule 405 makes it clear that such a reading did not survive the subsequent adoption of the Federal Rules of Evidence.

■ The government also urges that because the character witnesses testified, improperly but without objection, to specific acts of beneficence on McCann's part, the defense opened the door to other crimes evidence. We fail to see why the government's failure to object to character testimony going beyond that permitted by rule 405(a) should be a ground for the admissibility of other crimes evidence otherwise inadmissible. The same contention was made and rejected in *United States v. Benedetto,* 571 F.2d 1246, 1250 (2d Cir. 1978).

■ Finally, the government argues that even if the court erred in admitting the Winner testimony as rebuttal of character testimony the error was harmless, because the court had erred in refusing to admit the testimony under rule 404(b) when it was offered as a part of the prosecution's direct case. Winner's testimony, it is said, was probative of McCann's participation in a common scheme or plan, and of the modus operandi of that plan. However the indictment charges a common plan with the Levitt Agency only. It is true that the modus operandi of the Winner offenses was in some respects similar to that of the Levitt offenses. But the evidence must still be

evaluated, under rule 403, for undue prejudice, confusion of issues, and needless presentation of cumulative evidence. *United States v. Long,* 574 F.2d 761 (3d Cir. 1978); *United States v. Cook,* 538 F.2d 1000 (3d Cir. 1976). While in most instances we would defer to the district judge's sound discretion concerning a rule 403 issue, *see United States v. Long,* 574 F.2d at 767, where, as here, the evidence was admitted under a different theory from that urged on appeal, and defense counsel strongly objected to its prejudicial effect, a more searching inquiry is required.

■■■ In determining the probative value of evidence under rule 403 we must consider not only the extent to which it tends to demonstrate the proposition which it has been admitted to prove, *United States v. Stirone,* 262 F.2d 571, 576 (3d Cir. 1959), *rev'd on other grounds,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), but also the extent to which that proposition was directly at issue in the case. *United States v. Cook, supra,* 538 F.2d at 1004. In this case, the fact that the means used to commit the charged and uncharged crimes were somewhat similar had little probative weight, particularly since the jury had already been informed by Levitt that the 50% payment scheme, far from being unique, had been used with many other magistrates in Allegheny County. In view of that testimony, it cannot seriously be argued that the modus operandi described in Winner's testimony was so unusual and distinctive that its similarity to the modus operandi described by Levitt by itself justified an inference that McCann had participated in both transactions. Moreover, modus operandi was at best a collateral issue in the case. What was centrally in issue was whether McCann was the kind of person who would take a bribe. The Winner testimony, if believed, tended to show that McCann was just such a person. Its effect was thus highly prejudicial to his defense. Since the probative value of the evidence as modus operandi testimony was clearly outweighed by its prejudicial effect on McCann's character defense, we hold that it was proper to exclude the evidence when it was offered in the government's direct case, and that its admission on an impermissible theory in rebuttal was not harmless error.

Because the court erred in admitting evidence of other crimes committed by McCann his sentence must be vacated and the case remanded for a new trial.

Defendant McCann also contends:

(1) that the government's proof established multiple rather than a single conspiracy;

(2) that a violation of 18 U.S.C. § 1962(c) and (d) occurs upon the making of an agreement and is not a continuing offense, and thus that the offense took place prior to the effective date of the statute;

(3) that the government failed to prove the elements of a § 1962 offense;

(4) that his severance motions should have been granted;

(5) that § 1962(c) is unconstitutionally vague;

(6) that the court's charge impermissibly broadened the charge made by the grand jury; and

(7) that the court should reconsider the rulings it made in a prior appeal, *United States v. Forsythe,* 560 F.2d 1127 (3d Cir. 1977).

On the record before us we find no merit in these contentions. Thus we reject his contention that the indictment should be dismissed rather than remanded for a new trial.

## HERMAN'S APPEAL

The Winner testimony was not admitted against Magistrate Herman, and in no way prejudiced him. He urges two grounds for the grant of a new trial which on the record before us we find to be without merit:

(1) that the government offered no evidence tending to prove the predicate offense of bribery under Pennsylvania law, and thus did not prove a violation of 18 U.S.C. § 1962(c) and (d);

(2) that the court's charge impermissibly broadened the charge made by the grand jury.

These grounds require no discussion.

Herman also contends, however, that he was denied a fair trial because he was deprived of his sixth amendment right to have compulsory process for obtaining witnesses in his favor. At trial, Herman put on four witnesses. Three former constables in his office—James Regrut, Robert Williams, and William McHugh—testified that they had never split with Magistrate Herman any funds received from Levitt. Since, however, Regrut denied ever having received *any* money from Levitt, Williams stated that he had received money only for picking up bail jumpers, and McHugh was not required to testify as to the reason that he received money from Levitt, the force of this testimony was muted. Herman's secretary, Josephine Howe, testified that she had never made any referrals to bail bond agencies; that, to her knowledge, it was not Magistrate Herman's policy to make such referrals; and that, to her knowledge, Magistrate Herman had never taken any bribes or kickbacks in the performance of his duties.

In addition, Herman proposed to call as defense witnesses McHugh and three other constables who had on occasion done work out of Herman's office. Relying upon prior admissions made by the constables to the FBI and the grand jury, he represented to the court that their testimony would establish that some payments from the Levitt Agency with respect to bail bond business originating out of Herman's office went to one or more of the constables, who split the money among themselves without passing any along to him. The constables were subpoenaed. At a hearing out of the presence of the jury, however, McHugh invoked the privilege against self incrimination when asked about the disposition of funds received from Levitt. Counsel for the other three constables also informed the court that if asked about receiving or disposing of payments from the Levitt Agency each would assert the privilege against self incrimination and would refuse to testify.

A hearing was held on that assertion of the privilege at which it was established that each constable had been indicted for his alleged participation in the Levitt Agency bail bond conspiracy. Prior to the start of Herman's trial the charges against each of them had been dismissed without prejudice. The statute of limitations had not, however, run on the offenses, and the constables had not been granted immunity. The court quite properly sustained the constables' assertion of the privilege against self incrimination. Herman then moved that the government and the court grant them immunity, so that their testimony could be compelled, or in the alternative that the indictment should be dismissed. No suggestion was made that either the court or the government acted improperly in order to cause the constables to assert the privilege against self incrimination.

### A. *The Sixth Amendment Claim*

In support of his claim that the indictment should be dismissed because potential defense witnesses were not granted use immunity Herman relies on *United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976). That reliance is misplaced. In *Morrison* the government's attorney threatened and intimidated a defense witness who, prior to the government's activity, had indicated her intention not to assert the privilege against self incrimination. The witness then invoked the privilege and refused to testify. We held that the sixth amendment and the Due Process Clause guarantee to a defendant the right to subpoena a witness, and to have that witness available as he finds him. *See Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). The government's threats and intimidation had violated that right by depriving the defendant of that witness's testimony. *See Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). This violation warranted the dismissal of the indictment. We then turned to the separate question whether, because of the availability of use immunity under 18 U.S.C.

§§ 6002–6003, the government could cure the sixth amendment violation which it had committed. We held that it could:

> At the new trial, in the event that the defendant calls Sally Bell as a witness, if she invokes her Fifth Amendment right not to testify, a judgment of acquittal shall be entered unless the Government, pursuant to 18 U.S.C. §§ 6002, 6003, requests use immunity for her testimony.

535 F.2d at 229.

Here there has been neither threat nor intimidation, beyond that implicit in the existence of a penal statute and the availability of a new indictment. Herman would have us read the *Morrison* case for the proposition that defendants have a general sixth amendment right to demand that witnesses of their choice be immunized or that their indictments be dismissed. It does not so hold. The violation in *Morrison* was the government's threats and intimidation of the witness. The use of a grant of immunity from the executive branch, a creature solely of statute, and intended solely to benefit the government, was only a cure for that violation. In *United States v. Rocco,* 587 F.2d 144 (3d Cir. 1978), we recently rejected a contention substantially identical to the defendant's broader proposition. *Accord, United States v. Niederberger,* 580 F.2d 63 (3d Cir. 1978); *United States v. Beasley,* 550 F.2d 261, 268 (5th Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977); *United States v. Bautista,* 509 F.2d 675 (9th Cir.), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *United States v. Berrigan,* 482 F.2d 171, 190 (3d Cir. 1973); *United States v. Smith,* 436 F.2d 787, 790 (5th Cir.), *cert. denied,* 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971); *Earl v. United States,* 124 U.S.App.D.C. 77, 361 F.2d 531 (1966), *cert. denied,* 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967); *People v. Sapia,* 41 N.Y.2d 160, 391 N.Y.S.2d 93, 359 N.E.2d 688 (1976). *But see,* Westen, *The Compulsory Process Clause,* 73 Mich.L.Rev. 71, 166–170 (1974); Note, *The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses,* 91 Harv.L.Rev. 1266 (1978).

### B. *The Statutory Claim*

■ The dissent, however, constructs an ingenious statutory argument for a different result. Judge Garth, relying upon the judicial review provisions of the Administrative Procedure Act, reasons that the United States Attorney is an "agency" for purposes of the judicial review provisions of that act. He then concludes that, in the absence of an express prohibition in the Organized Crime Control Act of 1970 of judicial review of decisions to withhold immunity, such review is appropriate to determine whether the prosecutor's decision is in the "public interest." He further argues that the defendant has standing to seek such review.

This argument has several flaws. Of these, perhaps the most obvious is the fact that district court review of the immunity decision to determine whether it is in the "public interest" raises grave issues of separation of powers. Under the statute, the "agency" which makes the immunity decision is not merely the United States Attorney, but also the Department of Justice. Section 201(a) of the Act, 18 U.S.C. § 6003, provides that the United States Attorney may request a grant of immunity only with the approval of the Attorney General, the Deputy Attorney General, or a designated Assistant Attorney General. Thus any judicial review of the immunity decision must necessarily trench seriously upon the authority of the executive branch. Moreover, "public interest" review would necessarily require the court to weigh, if only in limited circumstances, the considerations that are traditionally associated with the decision to prosecute. Both the degree of intrusion and the nature of the proposed decision raise doubts of constitutional magnitude as to whether it is appropriate for a court to take on such a task.

These doubts are not new—in fact they were raised after the passage of the Immunity Act of 1954.[10] That statute, one of the predecessors of the current immunity stat-

---

**10.** C. 769, § 1, 68 Stat. 745, repealed Pub.L. 91–452, Tit. II, § 228(a), 84 Stat. 930 (1976).

utes, also required as a precondition for the order of immunity an application from the United States Attorney certifying that in his judgment the witness's testimony was necessary to the "public interest." It further provided that "upon order of the court" the witness could be required to testify despite his fifth amendment privilege. The statute, however, did not clearly specify the nature of the court's responsibility for review when presented with such an order. In *Ullman v. United States*, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956), a reluctant witness challenged the constitutionality of the 1954 Act on the ground, *inter alia*, that by providing for district court review of the United States Attorney's determination that an immunity grant was in the public interest, the statute required the court to perform a non-judicial function. In the district court, Judge Weinfeld found it unnecessary to pass upon the question "whether . . . a power in the court to approve a grant of immunity offends constitutional limitations," *In re Ullman*, 128 F.Supp. 617, 624 (S.D.N.Y. 1955), because the statute could fairly be construed as requiring the district court to do no more than determine that the United States Attorney and the Justice Department were in fact in agreement that the grant of immunity was in the "public interest," and because such a construction was required by the policy of avoiding unnecessary decision of constitutional questions. *Id.* at 624–28. Under this construction the role of the district court was simply to determine whether the formal prerequisites for an immunity grant had been complied with before granting the order.

On appeal, the Supreme Court strongly endorsed Judge Weinfeld's reasoning, holding that:

> [s]ince the court's duty under § (c) [of the Act] is only to ascertain whether the statutory requirements are complied with by the grand jury, the United States Attorney, and the Attorney General, we have no difficulty in concluding that the district court is confined within the scope of "judicial power." *Interstate Commerce*

*Commission v. Brimson*, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047.

350 U.S. at 434, 76 S.Ct. at 504.

The legislative history of section 6004 of the current use immunity statute makes it clear that Congress knew of the construction adopted in *Ullman* and approved of it. On the subject of judicial review, the House Report stated that "[t]he court's role in granting the order is merely to find the facts on which the order is predicated." H.R.Rep.No.91–1549, 91st Cong., 2d Sess., reprinted in [1970] U.S.Cong. & Admin. News, pp. 4007, 4018. In conjunction with this direction, the Report then cited with approval *In re Bart*, 113 U.S.App.D.C. 54, 58, 304 F.2d 631 (1962), where Judge Wright, relying on *Ullman*, had held that:

> [the "public interest" language of the immunity statute] does not address itself to the Judiciary. The application should say, explicitly, that such is the opinion of the United States Attorney and show the Attorney General's concurrence, but, having stated their conclusion, the government's attorneys need not justify it. *The court cannot review their judgment in this regard.*

*Id.* at 58, 304 F.2d at 635. (emphasis added) (footnote omitted).

There is thus overwhelming judicial and legislative authority for the proposition that review on the merits of a federal prosecutor's decision to grant immunity is barred by statute. The dissent, however, concludes that a contrary rule must prevail in the case of a decision not to grant immunity. We cannot agree. The same separation of powers concerns that compelled *Ullman's* construction of the statute to deny any possibility that a court might bar the prosecutor's application for a grant of immunity apply with equal force to a court order requiring such a grant. It may be true that the "interests" of the judicial branch are more implicated by a denial of immunity than by a grant thereof. But surely the gravamen of the *Ullman* holding is that judicial interests of nonconstitutional stature are insufficient to permit intervention in the prosecutor's immunization decision.

Even if constitutional separation of powers concerns and the statutory construction founded upon them did not wholly bar the notion of review advanced in the dissent, the purpose and structure of the statute would persuade us that Congress did not intend to provide for such review at the behest of a criminal defendant. The Administrative Procedure Act grants standing to seek review only to those persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702 (1977). It is well settled that to meet this requirement the person seeking review must show not only injury in fact, but also that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *E. g., Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 151–53, 90 S.Ct. 827, 25 L.Ed.2d 184; *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). The dissent eschews reliance upon any constitutional provision. The defendant's protected interest must therefore derive from the immunity statute itself, as enacted in the Organized Crime Control Act of 1970. Yet nothing on the face of that statute or in its legislative history suggests any congressional intention to confer benefits of any kind upon the defendant. The express terms of the statute of course nowhere indicate that review is authorized. And insofar as the working of the statutory mechanism casts any light upon the purposes of Congress it indicates that improving the lot of criminal defendants was not among them. The only occasion for even the limited review expressly contemplated in the legislative history is when the prosecutor brings the issue of immunity before the court to request its assistance in coercing the witness. There can certainly be no fair implication from this restrictive provision for review that the statute also contemplates that the district court would in addition have the power to review, in a much more sweeping fashion, a decision of the prosecutor never presented to it at all.

■ The legislative history of the immunity statutes also shows no sign of a purpose to benefit defendants. The narrow purpose of the use immunity provisions was twofold: to eliminate those federal immunity statutes that required conferral of transactional rather than use immunity and to reduce the number and complexity of immunity statutes. The shift to use immunity was intended to take advantage of the more favorable view of use immunity expressed by the Supreme Court in *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).[11] *See Kastigar v. United States*, 406 U.S. 441, 455–59, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The clear intent of the shift to use immunity was to make it less costly for the United States Attorney to grant immunity, by allowing for fuller prosecution of both the defendant and the immunized witness. In broader perspective, it is apparent that the immunity statute was part of a massive program of legislation whose central purpose, as its opponents recognized,[12] was to strengthen the hand of the prosecution and to weaken that of the criminal defendant, in many cases to the full extent permitted by the protections of the Bill of Rights.

The total absence of any indication that Congress intended to create a protected interest in the defendant is particularly striking in view of the traditional assumptions on which the adversary system is founded. Surely Congress must have legislated with full knowledge that federal prosecutors have always had the ability to protect any defendant as to whom exculpatory material becomes available simply by dismissing the prosecution against him; that a defendant always retains the right to request a nonsuit where at the close of the prosecution's case the evidence for conviction is insuffi-

---

11. *See* H.R.Rep.No.91–1549, 91st Cong., 2d Sess. (1970), reprinted in [1970] U.S.Code Cong. & Admin.News, pp. 4007, 4018.

12. *Id.* at 4089 (Dissenting Views of Representatives Conyers, Mikva and Ryan).

cient as a matter of law; and that the jury must be convinced beyond a reasonable doubt before it can convict. Prior to the passage of the immunity statutes, these safeguards were, we presume, generally considered adequate to protect against the risk of unjustified conviction even when a critical witness pleaded the Fifth Amendment. If Congress felt otherwise and in fact intended to broaden the historical remedies available to defendants, it is inconceivable to us that it would have made this radical change in a statute which by its express terms leaves the power to request such relief solely in the hands of the prosecutor and which contains no hint in the statute or in the legislative history that such was its purpose.

For all of the foregoing reasons, we conclude that the federal immunity statute cannot legitimately be construed to authorize judicial review of the prosecutorial decision not to immunize a defense witness. Nor do we think that this construction of the statute raises any constitutional difficulties. We note, first, that the statute cannot be attacked on the ground that it unconstitutionally discriminates against defendants by making immunity available only in the discretion of the prosecution. Due process has never yet been held to require that the defendant be permitted to marshal precisely the same investigative and legal resources as the prosecution, and Congress could legitimately have concluded that the defendant should not be empowered by statute to impose upon the prosecution the burden of an unwanted grant of immunity. *In re Kilgo,* 484 F.2d 1215, 1222 (4th Cir. 1973). The cases decided under the Compulsory Process Clause do not suggest or require a different result. They hold no more than that the government may not act directly to prevent an otherwise willing and competent witness from testifying on the defendant's behalf. *See Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). They are therefore consistent with our analysis of the compulsory process right in *Morrison.* For the same reason, the Con-

frontation Clause decisions of the Supreme Court are also inapposite. They hold only that when the prosecution has made a decision to present evidence in its own case against the defendant, due process requires that such evidence be subjected wherever possible to the tests of reliability provided for by the sixth amendment. *E. g., Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). None of them involves judicial interference with the executive's discretionary decision whether to prosecute or to grant use immunity in exchange for testimony helpful to the prosecution.

### C. The Due Process Claim

We are aware that several courts have suggested that in a case where the government relies on the testimony of witnesses who have received a grant of immunity, it may have an obligation, as a matter of fundamental fairness, to grant use immunity for defense witnesses as well. *E. g., United States v. Alessio,* 528 F.2d 1079, 1081–82 (9th Cir.), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976); *United States v. Bautista, supra,* 509 F.2d at 677; *Earl v. United States, supra,* 361 F.2d 534 n. 1. *Cf. In re Kilgo, supra.* In this case both Victor Kozlowski and Mary Hupert testified against Herman under grants of immunity, and that question is therefore squarely before us. We adhere, however, to our conclusion that a grant of immunity was not required. The issue posed by the cited cases, we think, is not whether the legislative decision to leave the immunization decision in the hands of the prosecution was constitutionally permissible, but rather whether in the case before the court the prosecution has exercised that discretion in a manner that violates the Due Process Clause. In view of our governmental system's strong tradition of deference to prosecutorial discretion, *see United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Linda R. S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), and of the necessary

tendency of the executive branch to exercise that discretion in ways that make it more likely that defendants will be convicted, we think that the evidentiary showing required to justify reversal on that ground must be a substantial one. The defendant must be prepared to show that the government's decisions were made with the deliberate intention of distorting the judicial fact finding process. Where such a showing is made, the court has inherent remedial power to require that the distortion be redressed by requiring a grant of use immunity to defense witnesses as an alternative to dismissal. *United States v. Morrison, supra.* No such finding, however, is possible in this case. So far as it appears, the decision to immunize Kozlowski and Hupert was unrelated to the decision first to prosecute, and later to drop the prosecution of the constables.

But while we think that the court has no power to order a remedial grant of statutory immunity to a defense witness absent a showing of unconstitutional abuse, a case might be made that the court has inherent authority to effectuate the defendant's compulsory process right by conferring a judicially fashioned immunity upon a witness whose testimony is essential to an effective defense. The Supreme Court has authorized such grants in suppression hearings where the defendant's testimony is necessary in order to determine whether a violation of his fourth amendment rights has occurred. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). This court has applied the rationale of *Simmons* where necessary to vindicate both a double jeopardy claim, *United States v. Inmon,* 568 F.2d 326 (3d Cir. 1977), and an assertion of privilege under the Speech

or Debate Clause. *In re Grand Jury Investigation,* 587 F.2d 589, (3d Cir. 1978). It would seem that a case in which clearly exculpatory testimony would be excluded because of a witness's assertion of the fifth amendment privilege would present an even more compelling justification for such a grant than that accepted in *Simmons* itself. Moreover, we find hints of a due process right to have clearly exculpatory evidence presented to the jury, at least when there is no strong countervailing systemic interest that justifies its exclusion, in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).[13]

No case has been called to our attention where judicially fashioned use immunity has been granted to a witness, but analytically it is not immediately apparent why the power recognized in *Simmons* coupled with the constitutional right suggested in *Chambers* would not provide the basis for a grant of immunity in the proper circumstances. The existence *vel non* of such immunity power, and the standards which should govern its invocation and exercise, raise a host of difficult issues. It may be, for example, that such grants of immunity would on some occasions unduly interfere with important interests of the prosecution. Because the issue of inherent judicial power to grant use immunity was not raised in the district court, and the parties have not discussed it in the briefs or argument before us, we are reluctant to address it here. Moreover, *Niederberger* and *Berrigan* may well be regarded as at least *sub silentio* rejections of this rationale as well. If such inherent power is to be recognized and standards formulated for its exercise, that task should be performed in a case where the

---

13. In *Chambers,* the defendant in a murder trial was prevented from cross-examining a witness, who had previously made a sworn confession to the same crime, as to the circumstances of his subsequent retraction and his alibi, because the state court had ruled that the witness was not "adverse" to the defendant. He was also prevented from introducing three other informal admissions of the witness's guilt by a strict application of the state's hearsay rules. The Court recognized the state's legitimate interest in the administration of its criminal justice sys-

tem, but found that the underlying purpose of its hearsay rules had been satisfied in the circumstances of the case. It then held that mechanical application of these rules to exclude evidence "critical" to Chamber's defense "denied him a trial in accord with traditional and fundamental standards of due process." 410 U.S. at 302, 93 S.Ct. at 1049. Where the prosecution's interest in withholding immunity was merely formal, the *Chambers* rationale might perhaps permit a grant of immunity.

issue was presented by the defendant, and perhaps by the court sitting in banc.

The judgment of sentence in No. 78–1282 will be vacated and the case remanded for a new trial of Magistrate McCann. The judgment in Magistrate Herman's case, No. 78–1252, will be affirmed.

GARTH, Circuit Judge, concurring in part and dissenting in part:

I fully join the majority's opinion insofar as it disposes of the claims raised by defendant McCann on appeal. I also agree with the majority insofar as it disposes of the claims raised by defendant Herman save his claim that his rights were violated when the government refused to request immunity for certain witnesses whom he wished to call, but who declined to testify because of their fifth amendment privilege. The majority reviews this "immunity" claim and concludes that Herman's constitutional rights were not violated. I have grave doubts as to whether the majority has set forth the proper standard of constitutional review for such cases. Nevertheless, I recognize that there is little point in discussing the constitutional issues presented by this case, for I am convinced that Herman's claim can and should be disposed of on statutory grounds. As set forth below, I think that the federal use immunity statute, 18 U.S.C. §§ 6001–05 (1977), should and must be construed as allowing judicial review for abuse of discretion when a United States Attorney refuses in appropriate circumstances to exercise his discretionary power to seek immunity for defense witnesses. Because this is the first time such a standard of review has been suggested by this Court, I would remand to the district court for application of this standard to the present case.

1. Pending indictments against the constables have been dismissed without prejudice. Although the government's extensive investigation of corruption with respect to bail bonding practices in the Pittsburgh area has apparently been completed, the government has shown little interest in prosecuting the constables at some future date. Nonetheless, if these constables were to be given use immunity, it would

I.

Herman, an elected district magistrate of the Pennsylvania judiciary, was convicted of accepting kickbacks on bond premiums received by the Levitt Agency, a Pittsburgh bail bonding business, in violation of the substantive and conspiracy provisions of the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. § 1962(c), (d). During the course of his defense, Herman served subpoenas on six of the constables formerly employed in his office to obtain their testimony on his behalf. However, at least four of these constables, in person or through their attorneys, informed the court that they would assert their fifth amendment rights if questioned about their receipt of funds from the Levitt Agency.[1] The district court judge held a hearing on this matter outside the presence of the jury, and evidence was proffered by Herman's counsel of the testimony of the four constables before the grand jury and during certain FBI interviews. This testimony indicated that the constables had indeed received kickbacks from the Levitt Agency, but that they had not shared these kickbacks with Herman, and that they had not informed Herman of this illegal activity. The constables would have testified to this effect at trial had they not asserted their fifth amendment privilege. Such clearly exculpatory testimony would have provided a substantial defense that any kickbacks made by the Levitt Agency to Herman's office were divided among the constables without Herman's knowledge or participation. However, the district court judge declined Herman's request that the court require the government to afford immunity to these constables so that they might testify in Herman's defense.

be a simple matter for the government to place the evidence that it currently holds under seal in order to establish readily at a subsequent prosecution of the constables that the evidence was not derived from their immunized testimony. Note, The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses, 91 Harv.L.Rev. 1266, 1274–77 (1978).

## II.

The majority meets Herman's contention that the government should have conferred use immunity on the constables by discussing the constitutionality of the government's refusal to request immunity. Implicit in the majority's position is the understanding that the exercise of the government's discretionary power conferred by the immunity statute may be reviewed for compliance with constitutional mandates. With this I agree. Based on the Supreme Court's decision in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and this Court's decisions in *United States v. Inmon*, 568 F.2d 326 (3d Cir. 1977), and *In re Grand Jury Investigation*, 587 F.2d 589, (3d Cir. 1978), the majority also acknowledges that "a case might be made that the court has inherent authority to effectuate the defendant's compulsory process right by conferring judicial [ ] immunity upon a witness whose testimony is [necessary] to an effective defense." Maj. Op. at 1204. I think that the majority is correct in this acknowledgement, and in reasoning that "a case in which clearly exculpatory testimony would be excluded because of a witness' assertion of the fifth amendment privilege would present an even more compelling justification for such a grant than that accepted in *Simmons* itself." *Id.*

Having come this far with the majority, I must express my reservations as to their articulation of the constitutional standard to be applied in reviewing the government's failure to request immunity. To establish a due process violation entitling a criminal defendant to a court-ordered grant of statutory immunity, the majority states that "[t]he defendant must be prepared to show that the government's decisions [in withholding immunity] were made with the deliberate intention of distorting the judicial fact finding process." Maj. Op. at 1204.[2]

Finding in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), "hints of a due process right to have clearly exculpatory evidence presented to the jury . . .," Maj. Op. at 1204, the majority then states in dictum that "[w]here the prosecution's interest in withholding immunity was merely formal, the *Chambers* rationale might perhaps permit a [judicially fashioned nonstatutory] grant of immunity." *Id.* at 1204 n.13. I believe the majority's latter formulation of the due process standard is closer to the fair trial concepts developed by the Supreme Court, for I do not think that a due process violation in the present context should require the defendant to prove the subjective bad faith of the government in order to establish his due process claim. No such requirement was imposed in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), where the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." This understanding of *Brady* is confirmed by the decision in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), where the Supreme Court established different standards of constitutional materiality applicable to different types of *Brady* violations. The Court specifically stated:

"Nor do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor. . . . If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."

2. Having specified what it considers to be the applicable standard of constitutional review, the majority then concludes that "[n]o such finding [of a constitutional violation], however, is possible in this case." Maj. Op. at 1204. I think it would be more appropriate to remand this case so that the district court could make this determination in the first instance. The district court certainty committed no error in proceeding as it did when Herman first requested that the constables be immunized, for this Court had not as yet clearly announced the proper standard of review for such cases. Now that this Court has specified a standard, it should be left for the district court's initial application.

427 U.S. at 110, 96 S.Ct. at 2400 (footnote omitted). In accordance with *Brady* and *Agurs*, I would find due process precepts offended when the government's failure to request immunity for a defense witness resulted in such a distortion of the fact finding process as to deny the defendant a fair trial, irrespective of whether or not this result was intended by the government.[3]

Nor is it apparent to me from the majority's opinion whether the majority views the sixth amendment's compulsory process guarantee as entirely congruent with the due process guarantee in this type of case. Substantial arguments have been made that a criminal defendant's compulsory process rights must be weighed independently against an otherwise valid governmental interest that would prevent the criminal defendant from presenting exculpatory evidence at trial. *See* Westen, Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases, 91 Harv.L.Rev. 567 (1978); Westen, The Compulsory Process Clause, 73 Mich.L.Rev.

71 (1974); Note, The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses, 91 Harv.L.Rev. 1266 (1978). *Cf. United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (dicta that balancing test would be employed in reconciling criminal defendant's compulsory process rights with claim of presidential privilege). Because of the way in which I think Herman's claim should be treated by this court, however, I do not find it necessary to address these troublesome constitutional issues.[4]

### III.

It is well understood that a federal court should first decide a litigant's nonconstitutional claims if this would obviate the need for a constitutional adjudication. Effect was given to this principle in *Siler v. Louisville & Nashville R. Co.*, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909), where the Supreme Court disposed of that case on pendent state law grounds rather than im-

---

**3.** Although *United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976), can be read as a "remedial decision" resting on rationales of deterrence and reparations following a finding of prosecutorial misconduct, *see* Maj. Op. at 1200, I do not understand *Morrison* to require a showing of any malevolent intention on the part of the prosecutor. Faced with a finding by the district court that the United States Attorney's actions were undertaken in good faith, the court in *Morrison* stated:

> The good faith of the Assistant United States Attorney would be relevant if *he* were charged with violation of 18 U.S.C. § 1503 which makes the intimidation of a federal witness a criminal offense. It is not, however, relevant to an inquiry into whether a *defendant* was denied his constitutional right.

535 F.2d at 227. (emphasis in original). The evidence that the defendant wished to present in *Morrison* was clearly crucial to his case, for it appears that the "defendant . . . and his lawyer planned his defense around the testimony of [the witness discouraged from testifying by the government], who allegedly was prepared to swear that it was she and not [the defendant] who had been involved in the conspiracy to sell hashish." *Id.* at 225. Thus *Morrison* is in no way inconsistent with the discussion and proposals expressed in this dissent.

**4.** In a series of cases, this Court has rejected without extensive consideration the argument

that a criminal defense has a general sixth amendment right to have immunity conferred on defense witnesses. *See United States v. Rocco*, 587 F.2d 144 (3d Cir. 1978); *United States v. Niederberger*, 580 F.2d 63 (3d Cir. 1978), *cert. denied*, ___ U.S. ___, 99 S.Ct. 567, 58 L.Ed.2d ___ (1978); *United States v. Berrigan*, 432 F.2d 171, 190 (3d Cir. 1973). I do not think that these cases foreclose the result which I contend should obtain here. First, these cases considered only a defendant's constitutional claim and not the statutory issues which I address. Second, in none of these cases was a record developed comparable to the record here.

I recognize that other circuits have also held that a criminal defendant has no general constitutional right to have immunity conferred on his witnesses. *See e. g.*, *United States v. Beasley*, 550 F.2d 261, 268 (5th Cir.), *cert. denied*, 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977); *United States v. Bautista*, 509 F.2d 675 (9th Cir.), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *United States v. Smith*, 542 F.2d 711 (7th Cir. 1976); *In re Kilgo*, 484 F.2d 1215 (4th Cir. 1975). I cannot help but think, however, that we have not heard the last word on this issue. *See State v. Broady*, 41 Ohio App.2d 17, 321 N.E.2d 890 (1974); *United States v. Leonard*, 161 U.S.App.D.C. 36, 81, 494 F.2d 955, 985 n.79 (1974) (Bazelon, C. J., concurring in part and dissenting in part).

pose a constitutional adjudication. The same principle has been invoked where a court is confronted with both federal statutory and constitutional claims. *Hagans v. Lavine,* 415 U.S. 528, 543, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *California Human Resources Department v. Java,* 402 U.S. 121, 124, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971); *Dandridge v. Williams,* 397 U.S. 471, 475–76, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). The weight to which this principle is entitled has recently been acknowledged in *Allen v. Aytch,* 535 F.2d 817, 819–20 (3d Cir. 1976), where this Court stated:

It is well established that federal courts will not pass upon a constitutional question if the issue presented in a case may be adjudicated on a nonconstitutional ground. That is also true where . . the nonconstitutional basis for the deci-

sion was neither raised in the pleadings nor ruled upon by the lower court. *See Gagliardi v. Flint,* 564 F.2d 112 (3d Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 3122, 52 L.Ed.2d 1147 (1978).

In this case, it is my opinion that Herman has a viable claim based on the federal use immunity statute. This statute, under the construction which I set out below, would allow a federal court to review, on other than constitutional grounds, the government's discretionary decision not to request immunity for a defense witness. I therefore turn to consideration of Herman's statutory claim since, in this case, I believe it may render unnecessary a constitutional adjudication.

## IV.

The current federal immunity statute is codified at 18 U.S.C. §§ 6001–05 (1977).[5] Unlike its predecessors,[6] it authorizes a

---

**5.** § 6003, which prescribes the procedure by which a grant of immunity is conferred on a witness, reads as follows:

§ 6003. Court and grand jury proceedings

(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

(b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment—

(1) the testimony or other information from such individual may be necessary to the public interest; and

(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

The scope of the immunity grant—prohibiting the use of testimony and evidence derived

therefrom in a subsequent prosecution against the witness—is set forth in § 6002:

§ 6002. Immunity generally

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

(1) a court or grand jury of the United States,

(2) an agency of the United States, or

(3) either House of Congress, a joint committee of the two Houses, or a committee or subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

**6.** The antecedents of the current immunity statute have been thoroughly discussed in a number of sources. *See Kastigar v. United States,* 406 U.S. 441, 443–47, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); Note, The Federal Witness Immunity Acts in Theory and Practice: Treading the Constitutional Tightrope, 72 Yale L.J. 1568 (1963); Wendel, Compulsory Immunity Legislation and the Fifth Amendment Privilege: New Developments and New Confusion, 10 St.

grant of *use* immunity rather than *transactional* immunity. An immunized witness may thus be prosecuted for crimes as to which he testifies, provided the government in its prosecution makes no use of the immunized testimony or of evidence derived therefrom. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *United States v. Apfelbaum,* 584 F.2d 1264 (3d Cir. 1978) petition for cert F.6d, 47 U.S.L.W. 3437 (U.S., Jan. 2, 1979). The statute empowers a United States Attorney [7] to obtain use immunity for an individual when "(1) the testimony or other information from such individual may be necessary to the public interest; and (2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination." *Id.* at § 6003(b).

As is apparent from the statutory text, the keystone to a United States Attorney's request for immunity is whether such a request will serve the public interest in terms of a full and fair presentation of evidence at trial. Neither the text nor the legislative history, however, fully clarifies what role, if any, the court has in this public interest determination. Once an immunity request has been made, the legislative history teaches that "[t]he court's role in granting the [immunity] order is merely to find the facts on which the order is predicated." H.R.Rep.No.91–1549, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.Code Cong. & Admin.News, pp. 4007, 4017 (1971). *See* Sen.Rep.No.91–617, 91st Cong., 1st Sess. (1969). In short, the Court's role in this situation is no more than ministerial. But this does not, of course, indicate the court's function when the government *refuses* to request, rather than applies for, immunity. Although the concept of separation of powers imposes certain constraints on judicial review of executive action, I believe that a court has power to review a United States Attorney's use of his discretionary authority in *refusing* to seek immunity for a defense witness. The proper standard of review, I conclude, is whether or not the United States Attorney has abused his discretion.[8]

### A.

Under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–06 (1977), the United States Attorney would appear to come within the definition of an "agency" for purposes of the review afforded by that statute. "Agency" is there defined as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency . . . ." 5 U.S.C. § 701(b)(1).[9] In giving practical content to

Louis U.L.Rev. 327 (1966); National Comm. on Reform of Fed.Crim.Laws, Working Papers, 1406–1411 (1970). *See generally* Symposium, The Granting of Witness Immunity, 67 J.Crim.L. & Criminology 129 (1976). These sources indicate that immunity statutes were enacted to supplement the "power of government to compel persons to testify in court or before grand juries and other governmental agencies," *Kastigar v. United States,* 406 U.S. at 443, 92 S.Ct. at 1655, in circumstances where that testimony would otherwise be unavailable because of the witness's assertion of a fifth amendment privilege.

The Supreme Court has recognized that the government is not the only one capable of legitimately demanding the testimony of citizens. A criminal defendant has a similar interest since "[t]he power to compel testimony, and the corresponding duty to testify, are recognized in the Sixth Amendment requirements that an accused be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his favor." *Kastigar v. United States,* 406 U.S. at 443–44, 92 S.Ct. at 1655.

7. The authority of a United States Attorney to request immunity is conditioned upon approval by the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General. 18 U.S.C. at § 6003(b).

8. As I have indicated above, I agree with the majority that a court may also review to determine whether the United States Attorney has acted constitutionally. *See* pp. 1205–1206 *supra.* However, before this review is undertaken, the court should review to determine *whether there has been an abuse of the United States Attorney's discretionary statutory authority.*

9. The appointment of United States Attorneys is provided for by 28 U.S.C. § 541 (1977), and their general duties specified in 28 U.S.C. § 547 (1977).

None of the statutory exceptions to the definition of agency in 5 U.S.C. § 701(b)(1) would

this definition, it has been stated: "The authority to act with the sanction of government behind it determines whether or not a governmental agency exists. The form the agency takes, or the function it performs are not determinative of the question of whether it is an agency . . . ." *Lassiter v. Gay F. Atkinson Co.,* 176 F.2d 984, 991 (9th Cir. 1949). *See Amalgamated Meat Cutters and Butcher Workmen v. Connally,* 337 F.Supp. 737 (D.D.C.1971) (three judge court) (President is "agency" within meaning of APA).[10]

The Administrative Procedure Act, 5 U.S.C. § 704, provides: "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to review." This section must be read together with § 701(a), which delineates the scope of the Judicial Review Chapter of the Administrative Procedure Act as follows: "This chapter applies, according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." In this case, neither the text nor legislative history of the immunity statute specifically provides for or precludes review. In such a circumstance, this Court should make its own determination as to whether the United States Attorney's power to request immunity for a defense witness has been so far committed to his discretion as to preclude judicial review altogether.[11] Undoubtedly, this inquiry is an appropriate judicial function.

The presumption of judicial review in the face of statutory silence has become a part of the fabric of the Administrative Procedure Act. *See Barlow v. Collins,* 397 U.S. 159, 166, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Against this presumption, important considerations for nonreviewability must be

raised in order to bar a judicial examination. Two principal reasons are generally thought to preclude review. The first—an apparent legislative intent to preclude review—is not applicable here. Nor do I think that the second reason for precluding review—that the issue as to which review is sought is deemed inappropriate for judicial attention—entirely bars review in this case.

### B.

In the core case in which the government requests immunity for a prosecution witness the court's role, as previously acknowledged, is merely ministerial. It is to determine the facts upon which the immunity request is predicated. Once having determined that the statutory requirements have been met, immunity must be granted as a matter of course. I do not contend for any form of judicial review when the government decides either to seek or not to seek immunity for a government witness. The limited province of the court in this circumstance, as the majority points out, is compelled by the constitutional doctrine of separation of powers. *See* Maj. Op. at 1200–1202. In formulating and prosecuting its case, the government must be relatively unconstrained in its deployment of resources. The choice of whom to prosecute and the strategy of prosecution are generally matters left wholly to the government's control. Rarely do these determinations have an impact on the fairness or reliability of proceedings before the court. While a grant of immunity for a government witness might be expected to bolster the government's case, the failure to seek immunity for a government witness cannot be said to affect the fairness of the trial process. The government in either event will bear the burden of proof beyond a reasonable doubt as to all elements of the crime

---

appear to exclude a United States Attorney from coverage.

**10.** *But see* 1 K. C. Davis, Administrative Law Treatise 8 (2d ed. 1978).

**11.** As Professor Davis has stated: "When a court can find no legislative guidance as to reviewability, obviously it must make its own

determination, and in doing so it necessarily creates a common law of reviewability. In all the vast mass of cases in which no legislative intent is discernible and in which no constitutional principle is invoked, the case law on reviewability is clearly common law." K. C. Davis, Administrative Law Text 509 (3d ed. 1972).

charged. *See In re Winship,* 397 U.S. 358, 364, 90· S.Ct. 1068, 25 L.Ed.2d 368 (1970). Moreover, since these determinations are largely internal to the executive branch, there is little reason to suspect that they will not accurately reflect the public interest. For these reasons, the judiciary must accept the limited function that Congress intended for the courts in the implementation of the immunity statute.

The analysis is quite different, however, when it is the criminal defendant, and not the government, who desires immunity· for a witness. The defendant has no authority to confer such immunity. Rather, the defendant must hope that the government will exercise its statutory authority to obtain immunity for the witness whose testimony the defendant desires. In such a situation, the court must be concerned with the public· interest determination and exercise of discretion of the United States Attorney. First, there is an obvious conflict of interest between the government and the criminal defendant. On this basis alone, a court must be suspicious of the government's refusal to grant immunity to a witness who seemingly has relevant, probative, and exculpatory testimony to offer. Second, if a criminal defendant's only exculpatory witness does not testify because of his fifth amendment privilege, the factfinder will be denied evidence highly probative of the guilt or innocence of the defendant. Not only will the trial process be less accurate and reliable, but it will be less fair because the defendant will have been prevented from fully presenting the case for his innocence. In this circumstance, I do not believe that we can presume that Congress has denied the judiciary review over the actions taken by an executive agency— the United States Attorney.

The type of judicial review that I have outlined constitutes no cognizable impairment of the concept of separation of powers. Since the United States Attorney's decision not to seek immunity for a defense witness will implicate the quality of the judicial process, the judicial branch has a keen interest in assuring that the discretionary power to grant immunity is not abused. Furthermore, a grant of immunity to a defendant's witness would not substantially affect the government's initial investigation and preparation of its case against the defendant. Of course the government may choose to respond to the testimony offered by a defendant's immunized witness, but it need not do so. And in any event, responding to defenses raised by a criminal defendant is something the government must do in the course of any criminal prosecution. The grant of immunity may concededly have some effect on the government's ability subsequently to prosecute the immunized witness. Although this factor is deserving of consideration, the Supreme. Court has emphasized that "immunity from use and derivative use 'leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege' in the absence of a grant of immunity." *Kastigar v. United States,* 406 U.S. at 458–59, 92 S.Ct. 1664. Since the grant of use immunity will not necessarily impair subsequent prosecution of an immunized witness, I conclude that separation of powers concerns are not so fundamentally trenched upon as to preclude judicial review of the government's refusal to seek immunity for a defense witness.

The majority, however, persists in claiming that the standard of review I propose somehow transgresses the concept of separation of powers.[12] *See* Maj. Op. at 1200–

12. The design of checks and balances fundamental to our tripartite structure of government is predicated upon, and in a sense is the converse of, the concept of separation of powers. *See* J. Madison, The Federalist Nos. 47–51. No one can dispute that the judiciary is charged with defining the boundaries of the respective branches of government. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed.

60 (1803). Moreover, the very possibility of judicial review prevents overreaching by either of the other two branches of government. As related to the immunity problem presented here, judicial review should operate to check any possible abuse by the executive branch when it refuses to request immunity for a defense witness.

1202. Cited in support of this proposition are *Ullman v. United States,* 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956), and *In re Bart,* 113 U.S.App.D.C. 54, 304 F.2d 631 (1962). Both cases involved the validity of contempt convictions imposed because each contemnor refused to testify before a grand jury concerning his membership and that of others in the Communist Party after each had been granted immunity under the Compulsory Testimony Act of 1954.[13] In each instance, it was held that a district court does not have discretion to deny an immunity request made by the government on the ground that the public interest does not warrant it—a holding with which I heartily concur. Neither decision, however, addresses the issue or precludes the result that I contend should obtain where the government refuses to seek immunity for a defense witness. I fully acknowledge, as those cases hold, that a court's role is ministerial when the government asks for immunity for a witness. This is true both when the government requests immunity for a witness in a criminal prosecution and when it requests immunity so that a witness will testify before a grand jury. But my thesis

is that these situations are clearly distinguishable from the instant case, for when the government refuses to grant immunity to a defense witness, its action necessarily affects the reliability and fairness of the trial itself. In addition, *Ullman* and *Bart* are inapposite because the Compulsory Testimony Act of 1954 provided for "transactional" immunity rather than "use" immunity. It cannot be disputed that a grant of "transactional" immunity, as distinguished from "use" immunity, threatens a significantly greater judicial inroad on prosecutorial authority, if such judicial intrusion is permitted. Here, of course, we are concerned only with a grant of "use" immunity.

### C.

The foregoing reasons compel me to interpret the current use immunity statute as permitting judicial review of a United States Attorney's failure to seek immunity for a defense witness.[14] By not seeking immunity, the United States Attorney has determined *sub silentio* that this course is in the public interest. Such a determination, I

---

13. C. 769, § 1, 68 Stat. 745, repealed Pub.L.91–452, Tit. II, § 228(a), 84 Stat. 930 (1976).

14. Some cases have held that a criminal defendant does not have standing to challenge a grant of immunity conferred on a government witness who testifies against him. *United States v. Rauhoff,* 525 F.2d 1170 (7th Cir. 1975); *United States v. Braasch,* 505 F.2d 139 (7th Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). *See United States v. Lewis,* 456 F.2d 404 (3d Cir. 1971) (transactional immunity statute). This is fully consistent with my conclusion that the decision to grant immunity in such a case is so far committed to the government's discretion as to preclude judicial review.

The same result does not obtain, however, when the government refuses to seek immunity for a defense witness. It cannot be doubted that the criminal defendant suffers injury in fact which is caused by the government's conduct. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 456 (1976). Whether the defendant is within the zone of interest to be protected by the statute, *see Association of Data Processing*

*Service Organizations v. Camp.,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), depends, of course, on the construction that is to be given to the statute. Under my view, the defendant is within that zone because the government's use of the immunity power as it pertains to the presentation of the defendant's case will impact upon the fairness and accuracy of the defendant's trial. To suggest that the use immunity statute is a weapon only of the government's arsenal would be to impute to the Congress a design to obtain convictions on the basis of an incomplete presentation of evidence. As Judge Gibbons has himself acknowledged ". . . it has been recognized for at least three centuries that the public has the right to every person's testimony. Every witness privilege is seriously in derogation of a general and fundamental duty." *In re Grand Jury Proceedings (Matter of Egan),* 450 F.2d 199, 222 (3d Cir. 1971) (en banc) (Gibbons, J., dissenting), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2479, 33 L.Ed.2d 332 (1972). Accepting my construction of the statute, it necessarily follows that the court has the power to provide the relief requested by the defendant in this case. *See Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

would hold, is subject to review for abuse of discretion. This limited scope of review constitutes, to my thinking, the minimal intrusion on the executive branch necessary to maintain the integrity of the trial process in this circumstance.

However, I would impose on the criminal defendant the threshold burden of not only demonstrating that the witness he wishes to call is available and willing to testify, but that the testimony to be presented is in fact exculpatory. I would require this to be shown by clear and convincing evidence. To carry this burden, it would not be sufficient if the evidence were merely cumulative of previously introduced evidence, or if it went merely to the credibility of the government's witnesses. The government would then have the opportunity to rebut the criminal defendant's showing and to introduce evidence as to why the public interest would be disserved by such a grant of immunity. This evidence might include such factors as the desirability and viability of a subsequent prosecution of the immunized witness. All of these factors would be weighed by the court in determining whether the United States Attorney's refusal to seek immunity constituted an abuse of discretion.

### V.

Having argued that a federal court may review a United States Attorney's decision not to seek immunity for a defense witness, I now turn to the remedy that a court may afford if an abuse of discretion is found. It is common ground that the federal use immunity statute does not confer on federal courts the power to grant immunity to trial witnesses. *See United States v. Garcia,* 544 F.2d 681 (3d Cir. 1976); *United States v. Housand,* 550 F.2d 818 (2d Cir.), *cert. denied,* 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977).

Nonetheless, it is apparent to me that the court has power to provide the relief which Herman seeks. If the government abused its discretion in refusing to seek immunity for Herman's witnesses, the government attorney should be informed that a judgment

of acquittal may be entered in the defendant's favor unless the government requests immunity. This is exactly the relief that was ordered in *United States v. Morrison,* 535 F.2d 223 (3d Cir. 1976), where the court found that the government attorney's threats directed toward the defendant's witness denied the defendant his sixth amendment and due process rights. The fact that *Morrison* involved a constitutional violation is not material as to the scope of the court's power to afford this remedy. So much was determined in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), where the court, under its supervisory power and not as a matter of constitutional interpretation, required that the government turn over to the defendant certain materials relating to the testimony of government witnesses. The court held that the government would be put to the choice of making these materials available or causing the prosecution to be dismissed:

> "The burden is the Government's, not to be shifted to the trial judge, to decide whether the public prejudice of allowing the crime to go unpunished is greater than that attendant upon the possible disclosure of state secrets and other confidential information in the Government's possession." *Id.* at 672, 77 S.Ct. at 1015.

I would put the government to the same choice if its refusal to grant immunity to a defense witness would otherwise amount to an abuse of discretion. This is fully consistent with my concept of separation of powers, for it amounts to the minimal intrusion on the power of the executive branch necessary to vindicate the court's interest and the criminal defendant's interest in the presentation of all evidence significantly relevant to the accuracy and fairness of the trial process.

### VI.

Having concluded that (1) a federal court may review a United States Attorney's discretionary refusal to request immunity for a defense witness after an appropriate showing has been made, (2) that the proper

standard of review in such a case is whether there has been an abuse of discretion or a violation of the constitution, and (3) that the proper remedy exists when discretion has been improperly exercised, I would remand this case for review by the district court in accordance with these instructions and under these standards. Because this is not the disposition decided upon by the majority, I am forced to dissent.

Garth, Circuit Judge, dissented and filed opinion.