**UNITED STATES of America**

v.

**John H. NACRELLI.**

**Crim. No. 78–165–1.**

United States District Court,
E. D. Pennsylvania.

March 21, 1979.

Peter F. Vaira, U. S. Atty., Gregory T. Magarity, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

A. Charles Peruto, Philadelphia, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Defendant, John H. Nacrelli, was found guilty by a jury on all five counts of an indictment charging him with participating in the conduct of the affairs of the Chester Police Department through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), conspiracy to participate in the conduct of the affairs of the Chester Police Department through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d), conspiracy to obstruct law enforcement with the intent to facilitate an illegal gambling business in violation of 18 U.S.C. § 1511, and filing a false income tax return in violation of 26 U.S.C. § 7206(1). This, the second trial of the defendant, the Mayor of Chester, Pennsylvania, consumed twenty-five days before a sequestered jury. The first trial, which ended with a hung jury, was of twenty-two days duration before a sequestered jury. The defendant has filed motions, in the alternative, for arrest of judgment, judgment of acquittal, and a new trial. The court has considered these motions without the benefit of a transcript.[1] For the reasons hereinafter set forth, defendant's motions will be denied.

## I. MOTION FOR ARREST OF JUDGMENT.

■ In his motion for arrest of judgment, defendant merely paraphrases the language of Rule 34, that "the indictment does not charge an offense or the Court was without jurisdiction of any offense so charged." The defendant has provided nothing further in support of these contentions, and the court finds them to be without merit. Therefore, the defendant's motion for arrest of judgment is denied.

## II. MOTION FOR JUDGMENT OF ACQUITTAL.

■ In support of his motion for judgment of acquittal, the defendant contends that the evidence was insufficient to support a guilty verdict as to any count. We find that the evidence produced at trial, viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Armocida,* 515 F.2d

---

1. The defendant moved for an extension of time to supplement his motions upon receipt of the transcript, but had not ordered the transcript at the time the court acted upon his motion for an extension of time.

29, 46 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975), is more than sufficient to support the verdict. The evidence presented at trial, viewed in the light most favorable to the government, may be summarized as follows:

In 1968, the Mayor was appointed to fill the remainder of the unexpired term of the previous Mayor of the City of Chester, Pennsylvania. In November 1969, he was elected Mayor, and continues to hold that office today. Chester is a third-class city; under Pennsylvania's Third Class City Code, the Mayor is directly responsible for the supervision and control of the Police Department.

Herman Hunt Fontaine and Frank Howard Miller operated an illegal gambling business, a numbers game, in Chester for a period of ten years or more. Their operation had in excess of sixty writers and a gross take of $25,000 per day at its peak. Fontaine was also a Republican committeeman in Chester, and a close associate of the Mayor, visiting with him in the Mayor's office several times each week.

In 1968 and 1969, Miller was experiencing the arrest of a number of his writers; he requested that Fontaine arrange, through the Mayor, a meeting with Joseph Eyre, the former Mayor and Republican City Chairman of Chester, to seek protection for his numbers business. Miller and Fontaine met with Eyre, and agreed to pay him $1200 per month, which Eyre split with the Mayor, in return for which the Mayor arranged for the Chester police to protect Miller-Fontaine numbers writers while arresting numbers writers working for their opposition. After approximately one year, Miller and Fontaine wanted to add a crap game to their operation, and Eyre agreed to protect it for an additional $400 per month, which was also split with the Mayor. The payments continued at the level of $1600 per month until 1971, when Miller's gambling operation at the Paradise Lounge was raided by the State Police. The payments were then increased to $4,000 per month, which Eyre said would be split equally among himself, the Mayor, Sam Dickey and Rocco Urella; the latter two were to provide protection from arrests by county and state police.[2] These arrangements were corroborated by tape recordings of conversations which took place on May 22, 1976 and June 17, 1976, among Eyre, Miller and Fontaine, during which payments were made and protection was discussed. These $4,000 per month payments to Eyre continued until about the time of Eyre's death in December 1976.

The Miller-Fontaine operation received the protection it bargained for during the period that payments were being made to Eyre. In 1974, a crap game operated by Miller and Fontaine at 813 Morton Street in Chester was raided by two city patrolmen who did not first seek authorization for the raid from their superior officers. These two patrolmen, Bright and Stepke, were transferred by the Mayor to turnkey duty as punishment for having made the raid. One of them remained a turnkey for two years. Another officer, Bondrowski, reported the location of another Miller-Fontaine crap game to the Mayor; by the time then Captain Hoopes investigated the report, the game had been moved. Lists of numbers writers in competition with Miller and Fontaine were given to Chester police officers for the purpose of arresting the competition. Among the officers given such lists with instructions to arrest the competition were Commodore Harris and Grady Berrien. Miller and Fontaine met with Harris and Berrien and provided further information concerning their competitors named on the list. In the fall of 1975, when an attempt was made on Herman Fontaine's life, the Mayor approved the assignment of these same two officers, Harris and Berrien, to act as Fontaine's bodyguards. Shortly thereafter, the Mayor promoted them to the rank of sergeant.

2. No evidence was presented, however, that Sam Dickey or Rocco Urella received any of these payments.

The Mayor confirmed to Fontaine that he was receiving his share of the payments to Eyre. On one occasion, while Eyre was in the hospital, Fontaine paid the entire $4,000 to the Mayor by placing the money in the refrigerator at Republican city headquarters. Fontaine later telephoned the Mayor, who acknowledged that he received the $4,000 left for him in the refrigerator.

On December 28, 1976, Joseph Eyre died. Shortly thereafter, the Mayor met with Miller and Fontaine at McCloskey's, a bar partly owned by the Mayor's wife. At that meeting, it was agreed that Miller and Fontaine would pay the Mayor $2,000 per month for protection from arrests by the Chester police. Miller and Fontaine paid the $2,000 directly to the Mayor in December 1976 and January 1977. However, from February through June 1977, payments were delivered to the Mayor by Rudolph "Sonny" Feliziani, a close associate of the Mayor who was timekeeper for the Chester police department and who also wrote numbers for the Miller and Fontaine operation.

In March 1977, Chief of Police Wright died suddenly. William Hoopes was temporarily appointed by the Mayor to take his place. Hoopes and the other two highest ranking officers who were under consideration for the Chief's position were reluctant to accept the position without an assurance from the Mayor that he would give them a free hand to run the police department. Hoopes took the position with such assurance from the Mayor.

After becoming Chief, Hoopes formed a vice squad headed by Detective Theodore Pokoy, with Officers Wyatt and Worrilow serving with him on the three-man squad. This squad arrested four Miller-Fontaine numbers writers in a period of a few months. In July 1977, Miller, Fontaine and the Mayor met at McCloskey's; the Mayor agreed that the $2,000 per month payments could be stopped temporarily because he could not control Hoopes and the vice squad.

In August 1977, Miller and Fontaine approached Pokoy in an attempt to bribe him directly to protect their numbers writers and arrest their opposition. Detective Pokoy reported this to the FBI, and under FBI direction, began to wear a body recorder, and authorized recordings of his telephone conversations with Miller and Fontaine. Miller and Fontaine agreed to pay Detective Pokoy $200 per month for protecting their writers, and $100 for each arrest he made of an opposition writer. Detective Pokoy was paid $200 per month for five months, plus a total of $500 for the arrests of five numbers writers who worked for the opposition. These arrangements were corroborated by eleven tape recordings of conversations that Pokoy had with Miller and Fontaine.

As part of the FBI undercover operation in which Detective Pokoy participated, several tests of the Mayor's participation in the Miller-Fontaine operation were set up. One of these tests was that Pokoy would advise Miller and Fontaine that he was unable to stop Wyatt from arresting Miller and Fontaine writers, and request that they should get the Mayor to remove him from the vice squad. On September 1, 1977, Miller and Fontaine told Detective Pokoy that they would have the Mayor remove Wyatt from the vice squad. Fontaine went to the Mayor and asked that Wyatt be removed. The Mayor and Chief Hoopes met on September 9, 1977 and the Mayor suggested that, as part of the formation of a "fifth platoon" which Chief Hoopes had requested, Wyatt would be transferred from the vice squad. On September 13, 1977, the Mayor told Chief Hoopes that Wyatt would definitely be moved. The events of September 1, 9 and 13 were corroborated by tape recordings.

A second test set up by the FBI to determine the Mayor's participation in the Miller-Fontaine operation was having Officer Wyatt go to the Mayor on September 16, 1977 and report to the Mayor that he believed Detective Pokoy was "on the take". The Mayor warned Fontaine that he had received such a report. On September 23, Fontaine told Detective Pokoy to be careful because the Mayor had heard from policemen that they thought Pokoy was taking

money from Miller. The conversations of September 16 and 23 were recorded.

The third test set up by the FBI to determine the Mayor's participation with the Miller-Fontaine operation concerned a report of the activities of a Miller-Fontaine numbers writers, Buddy Green. Officer Joseph Bail, Jr. prepared a report detailing the numbers writing activities of Green and delivered this report to the Mayor on October 12. The Mayor showed the report to Fontaine and on October 12, at 12:07 p.m., Fontaine called Detective Pokoy to discuss the details of the report. Fontaine suggested to Pokoy that he should arrest Green, so as not to arouse suspicion, and that Fontaine would make certain that Green was "clean" at the time of arrest. The Mayor did not give the Green report to the Chief of Police until later that same day.

In November 1977, Miller and Fontaine paid the Mayor a total of $1,900; $1,500 of which was delivered by Fontaine to the Mayor on November 1, and the remaining $400 was delivered by Fontaine to the Mayor on November 4. In December 1977, Miller and Fontaine were informed by the government that Detective Pokoy had been working with the FBI and that their conversations with Pokoy were taped and that they would be indicted on racketeering charges. Miller and Fontaine agreed to cooperate with the FBI. On December 23, 1977, Fontaine wore a body recorder when he went to make a payment of $1,100 to the Mayor. Fontaine and his car were searched by the FBI both before and after his visit to the Mayor. In addition, Fontaine was surveilled by the FBI while driving to and from the Mayor's office. Fontaine carried with him $1,100 when he want to the Mayor's office. On the tape recording of the meeting between the Mayor and Fontaine, Fontaine said to the Mayor as he handed him the $1,100, "Here, that's that one, and that's the other", referring to payments of $100 remaining due from the previous month, and $1,000 for the current month.

On January 10, 1978, Fontaine again wore a body recorder when he went to make a $1,000 payment to the Mayor. Once again, he was searched and surveilled by the FBI. Fontaine said on the tape, at the time he handed the Mayor $1,000, " . . . here, here's a thousand, and don't, and I can't give you no more until, ah—somewhere before the primary. What do you think?" The Mayor's response was "That's ok. Before the primary. Yea."

The Mayor did not report any of the payments received from Miller and Fontaine as income on his federal tax returns for 1976 and 1977.

At various times since November, 1971 the Mayor had access to three safe deposit boxes, two in his own name and one in the name of the Chester Republican Party. The records of his visits to these boxes show that, on ten occasions, within the same five or ten minute period, the Mayor visited the box in his name and the box in the name of the Republican party, both being in the Southeast National Bank. On one occasion, the Mayor went directly from Southeast National Bank to visit the third safe deposit maintained in his name at a bank across the Pennsylvania state line in Delaware.

The government's case was strong, and there can be no doubt that the evidence was sufficient to support the jury's verdict as to each of the five counts of the indictment. The evidence amply supports a finding that the defendant participated in the conduct of the affairs of the Chester Police Department through a pattern of racketeering activity, that he conspired to participate in the conduct of the affairs of the Chester Police Department through a pattern of racketeering activity, that he conspired to obstruct the enforcement of state and local laws with the intent to facilitate the illegal gambling business of Miller and Fontaine, and that he filed false income tax returns for the years 1976 and 1977. We, therefore, reject the defendant's contention that the evidence produced at trial was insufficient to support the verdict of the jury.

III. *MOTION FOR A NEW TRIAL.*

The defendant makes the following thirty-eight separate allegations of error in support of his motion for a new trial:

1. The court erred by denying the defendant's pre-trial motion to dismiss this indictment on the grounds of excessive pre-trial publicity.

2. The court erred by denying the defendant's pre-trial motion to grant a change of venue due to excessive pre-trial publicity.

3. The court erred by denying the defendant's pre-trial motion to continue the case due to excessive pre-trial publicity.

4. The court erred by denying the defendant's pre-trial motion to dismiss because of alleged prosecutorial misconduct in connection with pre-trial publicity, in which no hearing was provided.

5. The court erred by denying the defendant's pre-trial motion to immunize defense witnesses.

6. The court erred by denying the defendant's pre-trial motion for discovery.

7. The court erred by denying the defendant's pre-trial motion for bill of particulars.

8. The court erred by denying the defendant's pre-trial motion to suppress electronically obtained conversations.

9. The court erred in granting the government's motion to use electronically obtained conversations at the trial, including a Starks motion.

10. The court erred in restricting the voir dire examination of prospective jurors.

11. The court erred in denying certain challenges for cause made by the defense and also in granting challenges for cause made by the government during the voir dire process.

12. The court erred in concluding that the voir dire process had resulted in the obtaining of a jury free of the taint of the improper pre-trial publicity.

13. The court erred in admitting statements made by the defendant without sufficient prior and independent evidence of a corpus delicti.

14. The court erred in allowing the government to introduce hearsay testimony, particularly testimony about "common knowledge" of other persons, through the testimony of various government witnesses.

15. The court erred in allowing hearsay testimony under the guise of a "state of mind" exception to the hearsay rule, through the testimony of various government witnesses.

16. The court allowed testimony by various government witnesses about alleged payoffs to police officers by Fontaine and Miller without requiring testimony of any role or involvement attributable to this defendant.

17. The court unduly restricted cross-examination of government witnesses.

18. The court unduly restricted cross-examination of government witness Hoopes, particularly as to official police reports about which Hoopes was not allowed to testify for alleged hearsay reasons.

19. The court unduly restricted cross-examination of Hoopes further in that inquiry was not allowed as to alleged bias of the witness because of the relationship between the father of the witness and the FBI.

20. The court improperly allowed impeachment of defense witnesses with FBI reports which were not in the words of the witness, which were not adopted by the witness, and which were in the words of other persons (to wit: the FBI agents).

21. The court erred in not sufficiently allowing the defense to establish that Herman Fontaine threatened to kill the defendant in January of 1978.

22. The court erred in allowing cross-examination by the government of defense witnesses about a special counsel of the City of Chester having cleared government witness Hoopes of charges of alleged impropriety.

23. The court erred in allowing cross-examination of defense witnesses by the government outside the scope of the direct examination, particularly as to defense witness Osowski, in order to attack his credibility with regard to a conversation outside the scope of direct examination.

24. The court generally permitted excessive cross-examination of defense witnesses

by the government, particularly as to such examination being outside the scope of the direct testimony of that witness.

25. The court erred by refusing to allow the defense to show a letter from defense counsel to the prosecutor concerning the defendant's visit to his safe deposit box in December of 1978.

26. The court improperly allowed innuendo through government witnesses that the defendant ordered changes in police reports without there being sufficient evidence of the personal involvement of the defendant. The court generally allowed evidence of apparently improper activities within the Chester Police Department to be heard by this jury without there being sufficient evidence of the personal involvement or knowledge of the defendant.

27. The prosecutor was improperly allowed to cross-examine the defendant, particularly as to his dealings with Carr and as to Carr's prior business dealings with the City of Chester and the investigation of those dealings by the federal government. Furthermore, the court improperly allowed cross-examination of the defendant concerning a conviction of Carr for a 1978 fraudulent bank application.

28. The court improperly disallowed testimony from a defense witness, Sergeant Conway, concerning the lack of arrests by the Chester City Vice Squad since January of 1978.

29. The court further disallowed testimony from Sergeant Conway concerning the arrest in January of 1979 of Andre Singleton and a statement given at that time by Singleton concerning his allegedly still writing numbers for Frank Miller.

30. The court further disallowed testimony from Sergeant Conway for the defense concerning Captain Lastowska, who allegedly approached Conway concerning a threat against Conway should Conway testify with the defendant, which matters would have been appropriate under the issues of both credibility and prosecutorial misconduct.

31. Similar rulings as to Sergeant Conway were made by the court as to Detective Ianni.

32. The court exhibited bias against the defendant such as to deny the accused a fair trial.

33. The prosecutor committed error by making improper remarks in the presence of the jury in his opening speech, during the trial, and in his closing addresses.

34. The court erred in denying the several motions for a mistrial made by the defendant.

35. The court erred in denying the defendant's requested points for charge.

36. The court erred in granting those points of charge of the government to which the defendant objected.

37. The court erred in instructing the jury on items objected to by the defendant.

38. The court erred in denying the motions for a mistrial, motions to strike, and several objections by the defendant because of alleged prosecutorial misconduct.

*1–4. Pre-Trial Publicity.*

■ The defendant's first four allegations of error concern motions for continuance, dismissal of the indictment and change of venue in connection with pre-trial publicity. The court granted the defendant's motion for a continuance, held oral argument on the motion to dismiss the indictment, and held an evidentiary hearing on the motion for change of venue. Judgment on the motion for change of venue was reserved until voir dire of prospective jurors was completed, which is the preferable procedure. *United States v. Clark,* 398 F.Supp. 341 (E.D.Pa.1975), *aff'd,* 532 F.2d 745 (3d Cir. 1976); *see also United States v. Williams,* 523 F.2d 1203 (5th Cir. 1975). After lengthy individual voir dire, where liberal challenges for cause and additional peremptory challenges were granted, the Court found that a fair and impartial jury had been selected. Thus, we find that our rulings with respect to the defendant's motions concerning pre-trial publicity were without error.

### 5. *Immunity for Defense Witnesses.*

■ The defendant's fifth allegation of error is based on the court's denial of a motion to immunize defense witnesses. Our Third Circuit has suggested that a grant of immunity for defense witnesses might be appropriate in two circumstances. First, the trial court may order a remedial grant of statutory immunity upon a showing of an abuse of prosecutorial discretion of constitutional dimension. *United States v. Herman,* 589 F.2d 1191, 1204 (3d Cir. 1978). The defendant here has made no attempt to show an abuse of prosecutorial discretion. Second, the Court in *Herman* recognized that the trial court might in certain circumstances grant use immunity where a due process right is at issue:

> . . . a case might be made that the court has inherent authority to effectuate the defendant's compulsory process right by conferring a judicially fashioned immunity upon a witness whose testimony is essential to an effective defense. . . .
> It would seem that a case in which clearly exculpatory testimony would be excluded because of a witness' assertion of the fifth amendment privilege would present an even more compelling justification for such a grant than that accepted in *Simmons* [compelled testimony at suppression hearing to determine whether there was a fourth amendment violation].

*Id.* at 1204. Judge Garth, whose concurring opinion in *Herman* rested on the grounds of abuse of prosecutorial discretion, would require the following showing:

> However, I would impose on the criminal defendant the threshold burden of not only demonstrating that the witness he wishes to call is available and willing to testify, but that the testimony to be presented is in fact exculpatory. I would require this to be shown by clear and convincing evidence. To carry this burden, it would not be sufficient if the evidence were merely cumulative of previously introduced evidence, or if it went merely to the credibility of the government's witnesses. The government would then have the opportunity to rebut

the criminal defendant's showing and to introduce evidence as to why the public interest would be disserved by such a grant of immunity. This evidence might include such factors as the desirability and viability of a subsequent prosecution of the immunized witness. All of these factors would be weighed by the court in determining whether the United States Attorney's refusal to seek immunity constituted an abuse of discretion.

*Id.* at 1213. Here, the court denied the defendant's motion, with leave to renew it upon some showing that there was exculpatory evidence he wished to present. The defendant made no such showing. Therefore, we find that our pre-trial ruling was without error.

### 6, 7. *Discovery and Bill of Particulars.*

■ The defendant in his sixth and seventh allegations of error contends that the court erred in denying his motions for a bill of particulars and for discovery. The purpose of a bill of particulars is to " 'inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against second prosecution for an inadequately described offense'." *United States v. Addonizio,* 451 F.2d 49, 63–64 (3d Cir. 1972) (quoting *United States v. Tucker,* 262 F.Supp. 305, 308 (S.D.N.Y.1966)). The granting of a bill of particulars is addressed to the sound discretion of the trial court. *United States v. Armocida,* 515 F.2d 49, 54 (3d Cir. 1975). A bill of particulars is required only where the indictment is too vague and indefinite to accomplish these objectives. *United States v. Smith,* 405 F.Supp. 144, 146 (E.D. Pa.1975). A bill of particulars is not to be used as a discovery tool by the defendant. *Addonizio,* 451 F.2d at 64. The defendant here submitted a nine page list of requested particulars. We denied this request, finding that the indictment itself provided the defendant with such clear and definite information as to make a bill of particulars unnecessary. The indictment was drawn in sufficient detail to advise the defendant of the charges against him and to protect him

from a second prosecution for the same offenses. The indictment listed the date of each alleged racketeering act, and set forth the amount of money paid on that date. Alleged co-conspirators were also identified.

The government produced all discovery required by Rule 16. In addition, it provided all tape recordings to the defendant for review prior to trial. All other requests were properly denied, as they related to information clearly not discoverable, such as statements of persons whom the government did not intend to call as witnesses at trial, defendant's oral statements to persons whom he did not know were government agents, and lists of the names and addresses of all government witnesses.

Thus, we find that our pre-trial rulings in connection with the bill of particulars and discovery were proper.

### 8, 9. *Use of Taped Conversations.*

The defendant in his eighth and ninth allegations of error contends that the court erred in granting the government's motion to introduce electronically monitored conversations, while denying the defendant's motion to suppress them. The admissibility of tape recorded conversations is governed by *United States v. Starks,* 515 F.2d 112, 121 n. 11 (3d Cir. 1975), which requires the government to establish the following before a tape recording can be admitted into evidence:

"(1) That the recording device was capable of taking the conversation now offered in evidence.

(2) That the operator of the device was competent to operate the device.

(3) That the recording is authentic and correct.

(4) That changes, additions or deletions have not been made in the recording.

(5) That the recording had been preserved in a manner that is shown to the court.

(6) That the speakers are identified.

(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement."

The defendant stipulated to all of these requirements except that the conversations were made voluntarily and in good faith. Having heard testimony from witnesses (Herman Fontaine, Frank Miller, Theodore Pokoy, William Hoopes) who wore body recorders and/or permitted taping of their telephone conversations, the court determined that their participation was voluntary. The test is whether consent to the recording is voluntarily given; consent is not rendered involuntary merely because the person who consents expects some benefit therefrom. *United States v. Moskow,* 588 F.2d 882 at 891 (3d Cir. 1978). Therefore, the fact that Miller and Fontaine were cooperating with the government in the hope of receiving favorable treatment for themselves does not render their consent involuntary, and we find that our pre-trial ruling was without error.

### 13. *Hearsay Declarations: The Co-Conspirator Rule.*

The defendant, in his thirteenth allegation of error, contends that the court erred in admitting out-of-court declarations of co-conspirators against the defendant. Hearsay declarations of co-conspirators are admissible against other members of the conspiracy only upon a sufficient showing, by independent evidence, that the conspiracy existed, that defendant and declarant were members thereof, and that the declarations were made in furtherance of the conspiracy. *United States v. Nixon,* 418 U.S. 683, 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

It has long been the rule in the Third Circuit that the judge must find by "a fair preponderance of the evidence" that the conspiracy existed, that the defendant was a member thereof, and that the declarations were made during the conspiracy and in furtherance thereof. *United States v. Bey,* 437 F.2d 188 (1971). This rule was not changed by the *Nixon* case. The Third Circuit in the *Trotter* case said:

We need not determine whether the standard referred to in *United States v. Nixon, supra,* has more to commend it then

the "fair preponderance" standard applied in this circuit. Since the "fair preponderance" standard is more severe than the prima facie standard, admission of hearsay under the former would *a fortiori* satisfy the latter. In the instant case, the application of the fair preponderance standard placed a greater burden on the prosecution than it would have borne under the prima facie standard alternatively urged by defendant Trotter. *United States v. Trotter,* 529 F.2d 806 (3d Cir. 1976).

In determining whether there is a preponderance of the evidence, the credibility of the evidence must be weighed. *Bey,* 437 F.2d at 191.

■ The court found ample credible evidence, independent of declarations of co-conspirators, that the conspiracy existed, that defendant was a member thereof, and that each declaration introduced in evidence was made during the conspiracy in furtherance thereof. Furthermore, the court, in making this finding, outside the presence of the jury, advised the defendant that he could renew his motion to strike the hearsay declarations of co-conspirators at any time he believed the credibility of the independent evidence supporting this finding had been destroyed.

14, 15. *Hearsay Declarations: State of Mind.*

The defendant, in his fourteenth and fifteenth allegations of error, contends that it was error for the court to admit testimony of certain government witnesses on the basis of the state of mind exception to the hearsay rule, which testimony he characterizes as "common knowledge" testimony. While the defendant does not specify the testimony to which he refers here, the court assumes that he is referring to the testimony of witnesses who were members of the

Chester Police Department. These witnesses, e. g., Theodore Pokoy, Joseph Bail, Jr., Timothy Gill, testified that they were afraid to arrest Miller-Fontaine numbers writers because they had been told over the years by fellow police officers that Miller and Fontaine paid for police protection, and that any officer arresting their writers would be punished. They also testified that they had observed other officers receive punishment for making such arrests.

■ Under Federal Rule of Evidence 801(c) hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The witnesses' declarations at trial that they feared arresting Miller-Fontaine numbers writers are obviously not hearsay, since they were the witnesses' statements concerning their own state of mind at a particular time.[3] These same witnesses testified that the basis for their fear was two-fold: (1) their personal knowledge that certain officers had been punished for arresting members of the Miller-Fontaine gambling operation, and (2) that they had been told by fellow police officers that Miller and Fontaine paid for police protection and any officer arresting a member of their operation would be punished. The testimony as to what other officers had told them is likewise not within the definition of hearsay, since the declarations of the other officers were admitted, not for the truth of the matter asserted, but to show the effect on the officers who testified.[4] *See McCormick Evidence,* 2d ed., 1978, at 589; 4 Weinstein, *Evidence,* ¶ 801(c)(01) at 801–62–63. The actions of police officers, or their fear to take action, with respect to the Miller-Fontaine gambling operation, were directly relevant to the issue on trial, i. e., whether the racketeering operation of Miller and Fontaine was being protected by the Chester

3. In any event, should such statements be considered hearsay, they would fall within the "declarant's then existing state of mind." Rule of Evidence 803(3).

4. An alternative basis for the admissibility of the testimony as to what other officers told the

witnesses, if such testimony is considered to be hearsay, is the state of mind exception, Rule 803(3). Such testimony reflects the state of mind of the declarant officers, who did not testify at trial.

police as a result of payments to the Mayor. The testimony of police officers as to their fear of punishment should they arrest numbers writers was a small portion of the overwhelming evidence presented by the government showing that the Mayor was receiving payments to protect the gambling operations of Miller and Fontaine.

### 16. Defendant's Personal Knowledge.

■ The defendant, in his sixteenth allegation of error, contends that it was improper to permit testimony concerning payoffs to police officers by Miller and Fontaine without evidence that the Mayor was directly involved with the payment. The government did produce evidence that the Mayor, who had full responsibility for the Police Department in this third class city, had knowledge that Miller and Fontaine, who were admitted members of the conspiracy, were making illegal payments to the police and took no action to stop them. Such evidence included the testimony of Fontaine that payments were discussed with the Mayor, and the Mayor's own statements in the January 10, 1978 tape recorded conversation with Fontaine concerning the payments which Miller was making to Detective Pokoy. We, therefore, find no error in our rulings concerning the admission of such evidence.

### 18, 19. Cross-Examination of Chief Hoopes.

The defendant, in his eighteenth and nineteenth allegations of error, contends that the cross-examination of Chief Hoopes was unduly restricted in that he was not permitted to question the Chief about offi-cial police reports, nor was he permitted to question him about an FBI investigation concerning the Chief's father. The court permitted a lengthy cross-examination of Chief Hoopes as to whether his own reasons for cooperating with the FBI had anything to do with a potential FBI investigation of the Chief's father.

■ The court did refuse to permit the introduction of a police report of an investigation conducted by Inspector Timothy Gill concerning a search warrant sworn out by Detective Pokoy. The court's ruling at trial, which we reaffirm here, was that this police report was inadmissible because it was extrinsic evidence sought to be introduced for the purpose of impeaching Detective Pokoy as to a collateral matter. Such extrinsic evidence is clearly inadmissible. *United States v. Simmons*, 444 F.Supp. 500, 506–07 (E.D.Pa.1978), *aff'd*, 591 F.2d 206 (3d Cir. 1979).

### 20. Impeachment Through FBI Reports.

In his twentieth allegation of error, the defendant contends that it was error for the court to permit cross-examination of defense witnesses through the use of FBI 302 reports, which were reports, prepared by FBI agents, setting forth their recollection of interviews with the witnesses. These reports were not statements signed by the witnesses.

■ We ruled at trial that these 302 reports could be used as a basis for impeachment pursuant to Federal Rule of Evidence 613,[5] provided that a proper foundation was established. Prior statements

---

**5.** Rule 613 provides:

Prior Statements of Witnesses

(a) Examining witness concerning prior statement. In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be *shown nor its contents disclosed to him* at that time, but on request the same shall be shown or disclosed to opposing counsel.

(b) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a *party-opponent as defined in rule 801(d)(2)*. (Rule 613(b) was not at issue in this case, since the government did not seek to introduce extrinsic evidence of prior inconsistent statements.)

need not be in writing; a witness may be impeached by prior oral statements.[6] However, before a witness may be impeached by a prior inconsistent statement, a proper foundation must be laid to establish that it is in fact his statement. To satisfy this requirement, the cross-examiner must ask the witness whether he made the alleged statement, giving its substance and naming the time, place and person to whom made. McCormick, *Evidence,* at 72; Ladd, *Some Observations on Credibility: Impeachment of Witnesses,* 52 Cornell L.Q. 239, 247 (1967). The court here required that the government lay such a foundation in every case where an FBI 302 report was used for the purpose of impeachment pursuant to Rule 613. In each instance, copies of the 302 reports, when so used, were in the hands of defense counsel and were shown to the witness and the witness was afforded an opportunity to explain or deny the statement.

The Eighth Circuit examined the issue of admissibility of prior inconsistent statements for impeachment purposes, *United States v. Rogers,* 549 F.2d 490 (8th Cir. 1976), concluding that four requirements must be met before such statements may be introduced:

(1) Inconsistency (the trial judge has "considerable discretion to determine whether evasive answers are inconsistent with positive assertions of an extrajudicial nature." *Id.* at 496);

(2) Relevancy ("the inconsistency [must] relate to a matter of sufficient relevancy that the prosecution's case will be adversely affected if inconsistent testimony is allowed to stand." *Id.*);

3. Compliance with Rule 613;

4. Limiting jury instructions (the jury should be instructed that the testimony was only to impeach the credibility of the witness).

These requirements were met in connection with the cross-examination of witnesses concerning prior inconsistent statements in FBI 302 reports, and we find no error in our rulings at trial.

21. *Threats Against Defendant.*

██ The defendant, in his twenty-first allegation of error, contends that the court unduly restricted the defense in attempting to establish that Herman Fontaine threatened to kill the defendant. The court permitted extensive cross-examination of both Fontaine and Chief Hoopes together with the direct examination of the Mayor concerning the matter, an incident in a bar where Fontaine waved a gun about and shouted that he would shoot the Mayor if he were present. The only item rule inadmissible, in connection with this matter, was a newspaper account of the incident, which was clearly inadmissible as hearsay.

22, 23, 24. *Scope of Cross-Examination.*

██ The defendant, in his twenty-second, twenty-third and twenty-fourth allegations of error, contends that the court permitted cross-examination of defense witnesses beyond the scope of direct examination. The defendant points out, however, only two instances where such error is alleged to have occurred, i. e., in the cross-examination of defense witnesses Sharp and Osowski. It is not the examiner's questions which define the scope of cross-examination, but the answers he receives. *See* McCormick, *Evidence,* at 47–48. Cross-examination of defense witness James Sharp concerning special counsel to the Chester City Council was permitted on the ground that he had given testimony on the matter on direct examination. Similarly, defense witness Osowski was cross-examined as to inconsistencies in his direct examination concerning his recollection of the date of a conversation which he had with the Mayor. We find no error in so ruling.

---

**6.** Rule 801 of the Federal Rules of Evidence defines statement as "an oral or written assertion." *See also* McCormick, *Evidence,* at 72.

25. *Letter from Defense Counsel Concerning the Safe Deposit Box.*

■ The defendant, in his twenty-fifth allegation of error, contends that "the Court erred by refusing to allow the defense to show a letter from defense counsel to the prosecutor concerning the Defendant's visit to his safe deposit box in December of 1978." The reference to "showing" the letter is not clear. The court did, however, permit defense counsel to question the defendant concerning the letter which invited the government attorneys to be present at a visit to one of his safe deposit boxes in December 1978, shortly before his second trial began. We find no error here.

27. *Cross-Examination of Defendant Concerning Business Dealings with Charles Carr.*

■ The defendant, in his twenty-seventh allegation of error, contends that it was error to permit the government to cross-examine the defendant concerning his business dealings with Charles Carr. Mr. Carr was an associate and business partner of the defendant. The defendant testified on direct examination concerning his business dealings with Carr, including the contract which Carr's construction company, ESCO, had received for flood clean-up work in Chester. The defendant testified that a federal investigation of the flood contract had revealed that everything was proper. Cross-examination as to defendant's dealings with Carr, and the federal investigation of those dealings, was, therefore, relevant and within the scope of direct examination.

28, 29, 31. *Testimony Concerning Events After the Period of the Indictment.*

■ The defendant, in his twenty-eighth, twenty-ninth and thirty-first allegations of error, contends that it was error to exclude evidence of the activities of the vice squad of the Chester Police Department during the course of the trial. We believe we correctly excluded this evidence as irrelevant to the crimes charged in the indictment.

30. *Alleged Threat Against Witness.*

■ The defendant contends in his thirtieth allegation of error that defense Witness Conway was "threatened" by Captain Lastowska. When this matter was raised at a sidebar conference during trial, it was clear that the witness had not been threatened nor intimidated; it was merely alleged that Lastowska told Conway that, if Conway testified, he (Lastowska) would testify in rebuttal. The defendant, in his motion, provides no factual basis for a charge that the witness had been threatened.

35, 36. *Points for Charge.*

The defendant, in his thirty-fifth and thirty-sixth allegations of error, contends that the court erred in denying his requested points for charge. In fact, each and every one of defendant's requested points for charge was adopted and incorporated into the court's charge to the jury.

*Other Alleged Errors.*

While we have not herein discussed all the other contentions of alleged error raised by the defendant, we have considered each and every allegation of error and hold that none of them, singly or collectively, is of sufficient substance to merit any further discussion as a basis for granting a new trial in this case.

*Conclusion.*

Accordingly, an Order will be entered denying the defendant's motions for arrest of judgment, judgment of acquittal, and a new trial.