The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Robert MORISE, Defendant–Appellant.

No. 91CA0427.

Colorado Court of Appeals, Div. III.

Jan. 28, 1993.

As Modified on Denial of Rehearing April 15, 1993.

Certiorari Denied Oct. 4, 1993.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Jonathan Arnold Abbott, Asst. Atty. Gen., Denver, for plaintiff-appellee.

David F. Vela, State Public Defender, Beth L. Krulewitch, Deputy State Public Defender, Denver, for defendant-appellant.

Opinion by Judge CRISWELL.

Defendant, Robert Morise, appeals from the judgment convicting him of nine counts of embezzlement. Because we conclude that the trial court committed prejudicial error in the admission of evidence, we reverse and remand for a new trial.

Defendant was charged with a violation of § 18–8–407, C.R.S. (1986 Repl.Vol. 8B), which prohibits any "public servant" who comes into possession of any public moneys or property from knowingly converting the same "to his own use or to any use other than the public use authorized by law."

The evidence here was that defendant, a member of a local board of education, while at a board of education conference in Las Vegas, Nevada, used the credit card issued to him by the school district to obtain nine cash advances totalling over $3,700. It is undisputed that these funds were not, in fact, used for any school purpose.

At the trial, defendant's evidence, presented through the testimony of another witness, implied that he had obtained the cash advances in order to attempt to purchase sound, lighting, and technical equipment for the school district from musicians who were then on strike in Las Vegas, but that he was not successful in doing so. The funds received by him were later repaid to the district.

However, the superintendent of the school district testified that, upon hearing of the charges made to the district's credit card and contacting defendant with respect to the subject, defendant told him that he had obtained the cash advances to purchase costumes for his own theater company and that he had mistakenly used the wrong credit card. The superintendent also testified that, while defendant promised to repay the sums received by him, he failed to do so in a timely fashion.

This witness also testified that, because of previous problems with the use of the district's credit cards, the board of education had included certain provisions within the district's written policy on expenditures regulating the use of such cards. This policy, introduced as an exhibit, authorized "full reimbursement" to board members attending conferences "of actual and necessary expenses, including transportation, room, registration, meals, and miscellaneous expenses." It specifically provided that credit cards were to be provided to board members, but that they were required to be stored in the district's office when the board members for whom the card had been issued were not "in a travel situation," and that such cards were not to be used "for nonconference or nontravel related expenses."

I.

■ Defendant first contends that the evidence is insufficient to sustain his conviction. We disagree.

A.

The evidence here established that, while in Las Vegas, defendant received nine cash

advances over a period of two days, all in an even amount of $200, $300, or $500. Upon defendant's return to Colorado and the discovery of these advances by the school district, a demand was made upon him for reimbursement. However, it was only after the passage of nearly a month from the time that this demand was made and after he had initially delivered two checks to the district that would not have been honored by the bank had they been presented, that defendant finally repaid the district.

Given these circumstances, the jurors well could have determined that the reason for defendant's delay in reimbursing the district was because he had spent the cash for his own personal use, and it was, therefore, not available to be given back to the district. While defendant's evidence might also have supported an inference that defendant's delay in reimbursing the district resulted from an innocent error, the jury was not bound to accept this explanation.

### B.

■ As an alternative theory of guilt, the prosecution argued that, even if the cash received by defendant was not used by him for his own personal purposes, it was used for a purpose not authorized by law. Contrary to defendant's contention, we find sufficient evidence to support a guilty verdict on this theory.

The Colorado Constitution requires the Colorado General Assembly to provide for the organization of local school districts and for a board of education in each district which shall have the control of instruction in such district. Colo. Const. art. IX, § 15. In carrying out this mandate, the General Assembly has granted to each local board of education the power to procure supplies and equipment for musical and dramatic programs, § 22-32-110(1)(q), C.R.S. (1988 Repl.Vol. 9), to provide for the reimbursement to a board member of his or her necessary expenses, § 22-32-110(1)(n), C.R.S. (1988 Repl.Vol. 9), and to adopt policies, rules, and regulations for the administration of the affairs of the district. Sec-

tion 22-32-109(1)(b), C.R.S. (1988 Repl.Vol. 9).

The evidence here established that the board of which defendant was a member had established a specific policy that the district's credit cards could not be used for any "nonconference or nontravel related expenses." And, the evidence presented by the People would support the inference that defendant had actual knowledge of this restriction upon the use of the district's credit cards.

■ In order for a public official to commit the crime of embezzlement that was charged there, there need be no proof of a fraudulent intent. *People v. McKnight,* 39 Colo.App. 280, 567 P.2d 811 (1977). Under § 18-8-407, the only *mens res* requirement is that the actor *knowingly* convert the property.

Thus, even if defendant's implied explanation for his use of the credit card, that he obtained cash advances to attempt to buy musical equipment, was accepted, such use would nevertheless be one not authorized by the district's policy and would, therefore, be a use "other than the public use authorized by law" within the meaning of § 18-8-407. If defendant knew of the restriction upon use of the credit card and used the card in violation of the restriction, a violation of § 18-8-407 would occur.

The evidence presented, therefore, was sufficient to sustain a conviction under this alternate theory as well.

### II.

■ We do agree with defendant that the trial court erred in receiving into evidence three newspaper articles that attributed certain statements to defendant.

The three articles were published in November 1989 and January 1990 in the Rocky Mountain News and the Denver Post. Each article contained the by-line of a staff writer. The first reported on the investigation of defendant's use of the credit card, and the other two reported the filing of the charges against him.

The first article purported to quote statements made by the defendant to the effect that the cash withdrawals resulted from an accidental "mix up" with his own credit card. The later two articles summarized statements from the defendant that he obtained cash advances in an attempt to acquire equipment for the school district from striking musicians.

The prosecutor made clear to the trial court that these news accounts were being offered for the substantive purpose of proving that defendant did, in fact, make the statements attributed to him in these articles. And, for this purpose, the prosecutor subpoenaed each of the staff writers whose names appeared on the by-lines of the articles.

However, relying upon the privilege for newspersons created by § 13–90–119, C.R.S. (1992 Cum.Supp.), the staff writers and their employers moved to quash those subpoenas, and the court granted those motions. It held, nevertheless, that, because CRE 902(6) provides that "[p]rinted materials purporting to be newspapers or periodicals" are self-authenticating, the three articles were admissible without further proof that defendant did, in fact, make the statements to which the news articles referred.

Because all interested parties are not before this court, we do not pass upon the correctness of the trial court's decision that § 13–90–119(2)(b), C.R.S. (1992 Cum.Supp.) is inapplicable to the circumstances of this case. That provision exempts from the privilege of nondisclosure created by the statute "news information which has actually been published...." Nevertheless, we conclude that the trial court erred in ruling that CRE 902(6) authorized the admission of the news articles in question.

CRE 901(a), which is identical to Fed. R.Evid. 901(a), provides that, in order to authenticate or identify evidence, it is necessary only to produce "evidence sufficient to support a finding that the matter in question is what its proponent claims." Further, for the purpose of authenticating or identifying a document, CRE 902(6), like Fed.R.Evid. 902(6), provides that "extrinsic evidence of authenticity" is not required to be produced in order to authenticate a newspaper.

According to the committee which drafted the federal rules, the reason for the exception in Fed.R.Evid. 902(6) is that:

> The likelihood of *forging* of newspapers or periodicals is slight indeed. Hence, no danger is apparent in receiving them. Committee Note to Fed.R.Evid. 902 (emphasis supplied).

Thus, we agree that, absent evidence that the news articles offered were not genuine, those articles were self-authenticating, *i.e.*, it was unnecessary for the People to submit extrinsic evidence to establish that they were, in fact, news articles that appeared in the Rocky Mountain News and the Denver Post.

■ However, the mere fact that a document is *authentic* does not mean that it is also *competent evidence* of the facts contained in that document.

The committee note to Fed.R.Evid. 901 emphasizes this:

> It should be observed that compliance with requirements of authentication or identification by no means assures admission of an item into evidence, as other bars, hearsay for example, may remain.

Likewise, in speaking of the specific exception for newspapers from the requirement of extrinsic evidence, it is said that:

> Establishing the authentication of the publication may, of course, leave still open questions of authority and responsibility for items therein contained. Committee Note to Fed.R.Evid. 902.

Here, the news articles were inadmissible, not because they were not authentic, but because they constituted hearsay in its nearly pure form. And, they did not fall within any exception to the hearsay rule.

These news articles were not the statements of defendant; they were the statements of the two reporters who wrote them. *See* CRE 801(c) (hearsay is a statement by a person other than one made "while testifying at trial"). True, these

hearsay statements by the reporters contained what purported to be statements by the defendant, *see* CRE 801(d)(2), but the court prevented the People from offering any evidence, aside from the reporter's hearsay statements themselves, to establish that the defendant made such statements.

 It has long been recognized that a news article, if offered for the truth of its assertions, is hearsay and is inadmissible in nearly all circumstances. *See United States v. Abel*, 258 F.2d 485 (2d Cir.1958) (news article attributing statements to Commissioner of Immigration and Naturalization is inadmissible hearsay), *aff'd*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *United States v. Nacrelli*, 468 F.Supp. 241 (E.D.Pa.1979) (newspaper account of incident in which co-conspirator allegedly threatened defendant was inadmissible hearsay), *aff'd*, 614 F.2d 771 (3rd Cir.1980); *Watford v. Evening Star Newspaper Co.*, 211 F.2d 31 (D.C.Cir.1954) (trial court properly excluded newspaper account of accident and of offer by official of defendant to pay medical expenses).

The same is true here. The news articles were offered to prove the truth of the reporters' statements that defendant gave certain explanations for his behavior. As such, they were inadmissible hearsay and should not have been admitted.

 Further, we cannot conclude that their admission was harmless. These reports contained explicit information that defendant had made glaringly inconsistent statements as to the purpose for the cash advances. Although some of this information may have been presented in another form, we cannot say that, given the circumstances here, the introduction of these writings, which collectively summarized and emphasized defendant's prior statements, constituted only harmless error.

### III.

As we understand defendant's assertions with respect to the alleged impropriety of the general verdict in this case, they are grounded upon the underlying premise that there was insufficient evidence to support a determination that he committed embezzlement by devoting funds to a use other than that authorized by the board of education. Consequently, relying upon *James v. People*, 727 P.2d 850 (Colo.1986), he argues that, since only a general verdict was returned, the jury's determination cannot be sustained on either theory advanced by the People.

However, because we disagree with defendant respecting the sufficiency of the evidence, we need not reach this issue.

Likewise, because it is unlikely to recur on retrial, we need not address defendant's further contention that the court did not respond appropriately to an inquiry made by the jurors after they began their deliberations.

The judgment is reversed, and the cause is remanded for a new trial.

SMITH and ROTHENBERG, JJ., concur.